In the Matter of the Estate of NIKOLA ROMANIW, Also Known as NICOLAS ROMANOW, Also Known as NICHOLAS ROMANOW, Deceased.

Surrogate's Court, Westchester County, May 11, 1937.

*William R. Hogan,* for the proponent.

*Francis J. Wazeter,* for the distributees.

SHEILS, S. Under ordinary circumstances the admission to probate of an uncontested will requires only such attention as is necessary to satisfy the surrogate of its genuineness, its due execution, and that the other statutory formalities have been complied with. (Surr. Ct. Act, § 144.) Therefore, no objections having

been filed, the probate of this instrument would arouse no more than ordinary curiosity were it not for the unusual method adopted by the decedent in its execution. Because of the novelty of execution and the fact that a diligent search has failed to reveal any reported case in this State or elsewhere bearing upon a similar state of facts, comment on the law of the case is pertinent.

The decedent was a Ukranian of middle age. He could neither read nor write and could speak but little of the English language. He did odd jobs around the grocery and butcher store conducted by the petitioner, Nick Antoszyk, in the village of Hastings-on-Hudson. He was found dead in bed at his residence on Railroad avenue, Hastings-on-Hudson, on April 12, 1936, and his body was removed to the funeral parlor of Michael Maher in that village. Among his effects was found the paper writing dated April 25, 1932, now offered for probate. This paper writing was prepared upon a will blank in which the conventional portions are printed, the rest being typewritten, excepting, of course, the signatures and the addresses. The words " Left Hand " were written on the dotted line where the signature would ordinarily appear, and underneath these words are four fingerprints in blue ink.

The paper writing reads as follows: " I, Nikola Romaniw being of sound and disposing mind and memory, and considering the uncertainty of this life, do make, publish and declare this to be my last will and testament as follows, hereby revoking all other and former Wills by me at any time made.

" First, after my lawful debts are paid, I give unto Nick Antoszᵧk all my property, both real and personal, whole and entire in abs lute ownership, especially the following ennumerated insurance policics:

" Metropolitan Insurance Company
825250 — M
10439391
107945645
107986814
108348323
108348324

" Prudential Insurance Company
88577568
88577569

" I leave absolutely nothing, and make no provision for any relatives, and especially for my wife, whose whereabouts I do not know and from whom I have not heard for upwards of twenty years.

" I hereby appoint the said Nick Antoszyk the sole administrator and Executor of this my last Will and Testament and require that no bond be required of him for the faithful performance of his duties. IN WITNESS WHEREOF, I have hereunto subscribed my name, and affixed my seal, the 25th day of April in the year one thousand nine hundred and thirty-two.

" Witnesses:

NIKIFOR WARNOWSKY                ———Left Hand———

LEO W. GORDICH                  (Four fingerprints)

GEORGE PHILLIPS

" Subscribed by Nikola Romaniw the testator named in the foregoing will, in the presence of each of us, and at the time of making such subscription, the above Instrument was declared by the said Testator to be his last Will and Testament, and each of us, at the request of said Testator and in his presence and in the presence of each other, signed our names as witnesses thereto.

Hastings on Hudson, N.Y.

" NIKIFOR WARNOWSKY Residing 495 Warburton Ave.

" LEO W. GORDICH      Residing 627 Van Cortland Park Ave.

" GEORGE PHILLIPS     Residing 24 Cornell Ave. Yonkers."

The petition for probate was filed on June 9, 1936. It alleges that the decedent left him surviving one " Mongdaline Romaniw, a Wife of deceased whose post office address is unknown, having disappeared about 1912." No other distributees were mentioned in the petition. A citation to the widow was duly issued and published. On July 14, 1936, the matter was marked for proof of the subscribing witnesses. On July 16, July 23 and July 28, 1936, the witnesses to the paper writing appeared before the chief clerk of this court, and their oral testimony, together with the testimony of a fingerprint expert and other witnesses, was taken and reduced to writing.

Nikifor Warnowsky and George Phillips, two of the witnesses, testified that the decedent executed the paper writing in the store of Nick Antoszyk, the proponent, on Warburton avenue in the village of Hastings-on-Hudson, on April 25, 1932, in their presence. They further testified that the decedent, either before or simultaneously with the act of subscription, declared the instrument to be his last will and testament and requested each of them to sign his name as witness thereto. The testator subscribed the instrument by smearing the four fingers of his left hand with common blue ink taken from a bottle on the counter and by affixing the four fingers with the ink thereon upon his will. Leo W. Gordich, the third witness, testified that he signed the instrument at the request of the testator, in his presence and in the presence of George

Phillips and Nick Antoszyk. He could not remember whether or not Nikifor Warnowsky, the other witness, was present. He saw George Phillips sign his name as a witness. He read the will before he signed, but he did not remember seeing the testator affix his fingerprints to the will. All the witnesses agree that, at the time of the execution of the will, the testator was of sound and disposing mind and memory and was not acting under any restraint.

Dennis A. Sweeney, called as a witness in behalf of the proponent, testified that he had studied fingerprinting and its classifications for a year and a half, and that over a period of three years he had been taking fingerprints and classifying them in the Hastings police department and that he had also judged classifications in the files of the fingerprint department of the county of Westchester. On April 13, 1936, the day after this decedent died, the witness went to the funeral parlor of Michale Maher in Hastings-on-Hudson at the request of the attorney for the proponent and, in the presence of the undertaker and two police officers of that village, took two sets of fingerprints of the dead man, one of the right and the other of the left hand. With a fingerprint camera he also took a picture of the fingerprints on the paper writing, dated April 25, 1932, and, after developing this picture, compared it with the fingerprints taken of the dead man. He stated that, in his opinion, the fingerprints taken in the funeral parlors and the fingerprints on the will were those of the same person. He further testified that, generally, in the classification of fingerprints there are nine types: arches, tented arches, loops, whorl, central pocket, lateral pocket, twin loop, exceptional arch, and accidental. Asked to show some characteristic or similarity upon which he based his opinion that the fingerprints taken by him of the dead man and the fingerprints on the will were the same, he said: " This small finger, or the pinky we have here, we have a scar which is a distinct characteristic. This here print was taken four years ago and it was taken with ordinary ink which fades, but you have the scar showing in the same finger, indicating that that is a characteristic of that finger (indicating the pinky on print). Now in this here, the ring finger of the left hand, we have two scars in the upper part which we have in this finger here showing the same finger, you may be able to see it clearer on these photographs. Now in the same finger the inner terminus or core is a ' u ' in this manner [indicating by pencil drawing of letter u]. On the index finger is an inner whorl. You see ordinary ink fades and the printer's ink sets. The index finger has an inner whorl and the only similarity we can get which is an inner whorl is a core shaped in this manner [indicating with pencil]. That is really all the characteristics that you can get very clearly."

Subsequent to the taking the testimony of the witnesses, Francis J. Wazeter, an attorney of Yonkers, N. Y., filed a notice of appearance in behalf of the distributees of this decedent. He informed the court that the decedent had a wife and children living in Poland and that he had been in correspondence with them. The court then directed that an amended petition be filed showing the correct names and addresses of the alleged widow and children of this decedent and that a citation issue on such amended petition addressed to the proper persons. The amended petition was filed on February 17, 1937. It shows that the decedent left a widow, Magdalena Romaniw, three sons, Piotr Romaniw, Michael Romaniw and Alexander Romaniw, and two daughters, Anastasja Romaniw and Anna Romaniw, all residing at Powiat Rohatyn, Poland, and all of full age. A supplementary citation, returnable on March 30, 1937, was duly issued and returned with proof of the service thereof upon the above named persons by publication and mailing.

The attorney for the distributees has submitted a copy of a certificate of marriage on November 15, 1898, of one Nicolas Romanow to Magdalena Kowalczuk, in the parish of Nowy Martynow, diocese of Leopol, district of Rohatyn, Republic of Poland, together with extracts from the register of births of the administrative office of the parish of Martynow Nowy of the birth to Nickolas or Nicholas Romanow and Magdalene or Magdalena, his wife, of the following named children: Michael, on September 9, 1899; Anastasja, on May 27, 1902; Alexander, on April 21, 1904; Anna, on July 25, 1907; Peter, on October 7, 1911. He has also submitted the affidavit of one John Penderecki of Hastings, N. Y., which states that the decedent left a widow and children in Poland and that the decedent and his wife Magdalene, *nee* Kowalczuk, were the same persons he knew while living in Poland and that on occasions he had heard the decedent speak of his wife and children.

The history of fingerprinting was traced in an article entitled " Who Discovered Finger Prints " published in the Literary Digest on August 30, 1930. The article says: " Tons of controversial ink have been spilled on this subject. The answer depends on what the question means. Director Edmond Locard of the technical police laboratory of Lyons, France, tells in *Detective* (Paris), how the designs on the fingertips were known to the Chinese in 700 B. C., and described by European anatomists in the seventeenth century. Later, various scientists developed their use for identification, until the present wide-spread employment of criminal fingerprint bureaus in police work." Mr. Locard relates the work of Marcello Malpighi, the " grandfather of dacty-

loscopy," in 1686, and, following him Jean Evangelist Purkinje who wrote the first treatise on the subject in 1823. In 1858, Sir William Hershell, chief administrator of the Hooghly district of Bengal, began to use fingerprints to authenticate contracts written in Bengali. " ' It would seem that at first Hershell did not know that the imprint was unique, and could be identified. Perhaps he was simply utilizing the mystical idea held by both Hindus and Chinese, that a trace left of bodily contact was more binding than a mere signature. Long experience, however, satisfied Hershell of a fact that even Purkinje had not discovered — namely, that the papillary ridges are identificatory signs par excellence. In 1877 he sent in a semi-official request for permission to use the same method with prisoners.' " In London, in 1880, a letter from Dr. Henry Faulds, an English physician in a Tokyo hospital, appeared in *Nature* in which he told of studying numerous papillary prints on Japanese pottery and comparing them with the present day fingerprints. In his letter he indicated the possibility of discovering a criminal by identifying his fingerprints and gave a method for taking prints. He also indicated that he had been working on a classification of prints and that he believed it would be useful to preserve the fingerprints of criminals with their photographs. At this time, Sir Francis Galton, the English scientist, began investigations on the use of fingerprints for identification. By 1890 he had made a very important collection of them, and had devised a system of classification.

The New International Encyclopædia, volume 8, page 563, says, regarding fingerprints: " The patterns composed by the papillary ridges on the palms of the hands and soles of the feet possess two characteristics that adapt them peculiarly to the requirements of personal identification — persistence in general character through life, and wide variation as between individuals. These characteristics are especially marked in the case of the patterns of the fingers. Recognition of this fact has led to a widespread advocacy among men of science of the practice of obtaining and preserving the impressions of the finger patterns of persons whom it may later be necessary to identify with certainty. Among the proposed applications of the finger print the one of greatest general interest is its use as a means of criminal identification. Low as are the chances of error under the Bertillon system (q. v.), they are not altogether wanting. By supplementing the Bertillon measurements with records of finger prints identification can be made certain. The use of finger prints as a means of identification of soldiers has been proposed and in some cases has been practiced. *Another application of importance is as a substitute for*

*the signature on legal documents or as a supplement to such signature. The use of the finger print renders forgery impossible;* furthermore, it offers a means for securing *authentic evidence of the personal cooperation of an illiterate in the execution of documents in his name.* A number of financial institutions, both in the United States and in other countries, have experimented with the use of finger prints with satisfactory results, although without gains sufficiently striking to secure the wide acceptance of the plan." (Italics not in original.)

Since two of the witnesses saw the decedent affix his fingerprints to the paper writing, no further evidence was required to determine whether or not they were in fact his. The attorney for the proponent, however, took the precaution of having the fingerprints of the dead man taken and compared with the fingerprints on the will. While not necessary, the action taken was commendable in view of the fact that there might have been some confusion in the minds of the witnesses, as there was with one witness, with regard to the actual subscription. The testimony of two of the three witnesses, however, is clear on this point.

Section 21 of the Decedent Estate Law provides as follows:

" Every last will and testament of real or personal property, or both, shall be executed and attested in the following manner:

" 1. It shall be subscribed by the testator at the end of the will.

" 2. Such subscription shall be made by the testator in the presence of each of the attesting witnesses, or shall be acknowledged by him, to have been so made, to each of the attesting witnesses.

" 3. The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament.

" 4. There shall be at least two attesting witnesses, each of whom shall sign his name as a witness, at the end of the will, at the request of the testator."

The signature of a testator may be made in any of four ways:

1. He may subscribe his name personally;
2. A third person may subscribe it for him at his request;
3. Such third person may guide the testator's hand in writing;
4. The testator may make his mark. (1 Jessup-Redfield, 514.)

1 Jarman on Wills (5th ed.), page 106, says that in " Examining the requirements common to the Statute of Frauds and the Wills Act in their order, the next condition prescribed for the validity of a will is that it should be signed, which suggests the inquiry, what amounts to a ' signing ' by the testator?  It has been decided that a mark is sufficient, and that, notwithstanding the testator is able to write, and though his name does not appear on the face of the will.

A mark being sufficient, of course the initials of the testator's name would also suffice." (See, also, 1 Alexander Commentaries on the Law of Wills, pp. 578, 579, 580; 1 Jessup-Redfield, 519 *et seq.;* 40 Cyc. 1102.)

" The term signature includes any memorandum, mark or sign, written or placed upon any instrument or writing with intent to execute or authenticate such instrument or writing." (Gen. Constr. Law, § 46.)

It is immaterial by what token or representation an individual indicates that the signature to an instrument in writing is made by him when the same is acknowledged in due form of law before a proper officer. (*Conroy* v. *Bigg*, 109 N. Y. Supp. 914.)

Generally, a signature, if adopted as such, may be printed, lithographed or typewritten, as well as written. (*Brooklyn City Railroad Co.* v. *City of New York.* 139 Misc. 691, citing *David* v. *Williamsburgh City Fire Ins. Co.*, 83 N. Y. 265; Gen. Constr. Law, § 46.)

A will subscribed by a testator in the form or style of signature which is shown to have been adopted by the testator as his signature is sufficient, but in some way the act of subscription must be the act of the *intending* testator, not of another. (*Matter of Mooney*, 73 Misc. 315; *Matter of Irving*, 153 App. Div. 728; affd., 207 N. Y. 765; 1 Heaton, Surrogates' Courts [5th ed.], 226, 227; 68 C. J. 653.)

In *Matter of Severance* (96 Misc. 384 [1916]), the testator, a justice of the peace, prepared his will upon a will blank in which the conventional portions were printed, with blank lines to be written upon by the draftsman. Except for the printed portions of the will, it was entirely in the handwriting of the decedent. At the foot of the printed form was a dotted line, followed by the letters " L. S." in brackets. This line was left for the signature of the testator. In the will as executed there was no writing upon this dotted line but near the end of the line, partially covering the initials " L. S." a wafer seal was affixed, printed in colors and containing this inscription:

" Merry Christmas
American Red Cross. 1912
Happy New Year."

Written upon this seal in pen in the handwriting of the testator was this inscription: " C S Seal C S." The court said: " If the testator intended this holiday seal with his inscription upon it as a signature, and adopted it as such, I think it satisfies the requirements of the statute that a will must be subscribed by the testator. It is well settled that a subscription by making a mark and without

any written name is a compliance with the requirements of the statute (*Jackson* v. *Jackson*, 39 N. Y. 153), and it would seem logical to say that a signature by initials is entitled to as much respect as a signature by mark. No authorities in this State on this subject have been called to my attention, but the matter has been considered in other forums. In *Matter of Goods of Savory* (15 Jur. 1042) a will was upheld where the testator wrote only his initials; and in *Matter of Goods of Emerson* (L. R. [9 Ir.] 443) the will was also held valid where the testator affixed a seal stamped with his initials and pronounced it his hand and seal. In *Matter of Knox* it was held by the Pennsylvania Supreme Court (6 L. R. A. 353), that the first name only of a testator may be a sufficient signature to a will. It has been held in this state that an imperfect or indistinct subscription of a testator's name to his will may be regarded as his mark. (*Hartwell* v. *McMaster*, 4 Redf. 389.) It is a debatable question, incapable of exact solution, whether the testator intended to adopt this seal with this inscription as his signature, or whether he intended it as a seal only and neglected to sign his name. The disposition which the testator has attempted to make of his property is such a natural one, and the proofs are so clear that he intended this document as a testamentary disposition of his property, that I feel that the surrogate should not be astute to search for reasons for rejecting this will, but, on the other hand, should strive to sustain it, especially where the interested parties all being of full age raise no objections. I, therefore, hold that the testator adopted this seal and his endorsement upon it as a signature."

*Jackson* v. *Jackson* (39 N. Y. 153) is the leading case on the subject under discussion. In that case the court said (at pp. 159, 160): " The testator may subscribe the will by his full name or by his mark, and if he does so, *that* is the subscription required by the statute. And it would be effectual as such even though no one made the written memorandum thereof around such mark. Such memorandum is useful and important, not only as a guide to the memory of witnesses, and a cotemporaneous declaration of the purpose of the mark, and that it was made by the testator, but as a protection against fraud; but it is not of the essence of the execution. When it is necessary to prove the execution of an instrument by a ' marksman,' the proof is evidence of the *making of the mark;* the writing of the name around it is no essential part of the evidence. (*Jackson* v. *Van Duzen*, 5 J. 144; *Addy* v. *Grix*, 8 Ves. 504; *Butler* v. *Benson*, 1 Barb. S. C. 533; *Chaffee* v. *Baptist Association*, 10 Paige, 91.) It follows that whether the testator expressly directed such memorandum to be made or not, is wholly

immaterial, though upon the whole case it seems to me that such direction was substantially imported in what occurred. And whether the memorandum was made before or after the making of the mark is also unimportant. (1 Jarman on Wills, 101.)" (See, also, *Matter of Stegman*, 133 Misc. 745; affd., 227 App. Div. 647.)

Also, in *Matter of Corcoran* (145 App. Div. 129, 133) the court said: "It would be very unusual that one habitually signing by cross mark would exhibit peculiarities in signature differentiating his mark from that made by any other. Opinion evidence as to the genuineness of an ordinary cross mark signature is therefore not admissible. (*Matter of Hopkins*, 172 N. Y. 360.) Proof of testator's handwriting, filling the statutory requirement, is made, if one witness is able to verify the testator's mark as made in his presence. (*Matter of Wilson*, 76 Hun, 1.) It would seem that it is proof of the signature and not strictly proof of the handwriting of the testator that the statute requires."

The execution of the instant will by the decedent affixing his fingerprints at the end thereof shows that he had some familiarity with their use in executing legal documents. The evidence does not show who prepared the will. From its language, it may have been prepared by an attorney. Suffice it to say that its execution by means of fingerprints shows more than ordinary intelligence on the part of the testator. It was a far more effective way of executing the paper writing than if he had signed by an ordinary cross-mark.

My predecessor in office having died before the conclusion of this proceeding, this court has the power to complete the same. (Surr. Ct. Act, § 20, subd. 8; *Matter of Carey*, 24 App. Div. 531; *Matter of Lawrence*, 58 N. Y. Supp. 597; *Matter of Martinhoff*, 4 Redf. 286; *Matter of Johnson*, 27 Misc. 167; *Matter of Rawson*, 120 id. 713; *Matter of Goldthwaite*, 125 id. 265.)

I hold that the paper writing dated April 25, 1932, was executed as required by statute and it will be admitted to probate as the last will and testament of this decedent. (Dec. Est. Law, § 21.)

Submit decree accordingly.