James M. BRADLEY, Plaintiff,

v.

DEAN WITTER REALTY, INC. and Dean Witter Realty Growth Properties, Inc., Defendants.

Civil Action No. 95–11387–PBS.

United States District Court, D. Massachusetts.

May 30, 1997.

Joanne D'Alcomo, Schneider, Reilly, Zabin & Costello, Boston, MA, for James M. Bradley.

Gerald F. Rath, Bingham, Dana & Gould, Boston, MA, for Dean Witter Realty, Inc. and Dean Witter Realty Growth Properties, Inc.

***MEMORANDUM AND ORDER***

SARIS, District Judge.

## I. *INTRODUCTION*

Plaintiff James Bradley ("Bradley"), a hotel-industry consultant, seeks to recover payment of an incentive fee allegedly promised to him by defendants Dean Witter Realty, Inc. and Dean Witter Realty Growth Properties, Inc. (collectively "Dean Witter"). Dean Witter retained Bradley in July of 1993 to render financing and management advice regarding the Hyatt Regency Westshore in Tampa, Florida, a troubled Dean Witter hotel investment. The written employment contract provided that Bradley would receive a "base fee" of $10,000 a month for three months and, in addition, that Bradley would receive an "incentive fee" to the extent that one could be negotiated in terms that were satisfactory to both parties.

Bradley contends that the parties negotiated over the terms of the incentive fee pay-

ment and that they agreed upon an incentive fee arrangement under which Bradley would receive ten percent of the improved cash flow of the hotel for five years beginning in 1994, and five percent each year thereafter until the year 2003. Dean Witter maintains that no incentive fee agreement was ever reached, and it has refused to pay Bradley any amount above the base fee in exchange for his consulting services.

Dean Witter now moves for summary judgment. After a hearing, this Court *AL-LOWS IN PART* and *DENIES IN PART* Dean Witter's summary judgment motion.

## II. BACKGROUND

Drawing all inferences in favor of the non-moving party, the Court treats the following facts as undisputed.

Dean Witter is a Delaware corporation with its principal place of business in New York. As a part of its business, Dean Witter manages various properties, including the Hyatt Westshore ("the hotel"), a 448–room hotel in Tampa, Florida that is operated by Hyatt Corporation. By the summer of 1993, Dean Witter's luxurious hotel property was facing financial crisis. Seeking assistance in restructuring its investment, Dean Witter executives solicited Bradley, a hotel industry expert and former high-level executive who owns and operates a Massachusetts-based consulting firm that specializes in the hotel trade.

### A. Bradley Retained

Bradley had his first meeting with Dean Witter representatives in New York in June of 1993. Several Dean Witter spokesmen were present, including Ed Lord and Davisson Hardman. Before the meeting began, Bradley spoke with Lord about his consulting fee, telling Lord that his usual retainer was $350 per hour, but that, as an alterna-

tive, he would accept a smaller monthly stipend plus a substantial incentive fee. During the meeting, Bradley again explained his salary structure, describing the incentive fee as a percentage of the improvement in the investment status of the property. Due to the hotel's serious financial condition, both Lord and Hardman indicated that the incentive fee approach would be preferable to higher monthly payments. (Bradley Int. No. 5).

Lord later sent Bradley a written contract in Massachusetts on behalf of Dean Witter dated July 20, 1993. The agreement provided that, in exchange for various consulting services,[1] Dean Witter would pay Bradley a base fee of $10,000 per month from July 19, 1993 until October 19, 1993 (i.e., for a period of three months).[2] In addition, the contract provided for compensation in the form of

"an incentive fee (with a payment scheme), acceptable to both parties, in the sole discretion of each, to be structured during the term of this Agreement, which will be based upon (i) the improved net present value of the Hyatt–Westshore to its owner as a result of debt and management restructuring and/or (ii) the consummation of a Hyatt–Westshore management contract with a new management company, it being agreed that if the parties are unable to agree on an acceptable incentive fee, this Agreement shall terminate and Dean Witter shall not be obligated to pay Bradley any incentive fee."

¶ 4(b). The written agreement also provided that "the construction, interpretation and performance of this Agreement shall be governed by the laws of the state of New York." ¶ 8.

Shortly after the June 20, 1993 contract was executed, Dean Witter and Bradley began negotiations regarding the terms of the incentive fee (Hardman Aff.¶ 4). The parties

---

**1.** The contract specified that the services Bradley would provide would include: (a) services regarding the development of strategies and proposals to restructure the mortgage and management agreements; (b) negotiation, documentation and consummation of new financing and management agreements; (c) investigations of the hotel industry and presentation to Dean Witter of management and brand alternatives; and

(d) consultation on hotel operation improvements.

**2.** The contract provided that the agreement could be extended for another 60 days (i.e., until December 19, 1993) if Dean Witter advised Bradley of its desire to extend the agreement in writing by October 1.

negotiated primarily via telephone and fax machine, and documents relating to the amount and structure of Bradley's incentive payment were circulated among Dean Witter executives and between Dean Witter and Bradley on several occasions.

On August 12, 1993, Dean Witter drafted a memo proposing a structure that used operating cash flow estimates as benchmarks for the incentive fee calculation (the "Concept" Memo). In this written statement, Dean Witter offered to give Bradley Associates "five percent of improved Cash Flow After Debt Service ('CFADS') for 1994–2003 following the restructure of the Solus loan and Hyatt Management Agreement." Also, Dean Witter proposed an alternative, lump-sum payment to Bradley in the event of a sale "during the five-year incentive period." The Concepts Memo was revised internally on August 27, 1993, and sent to Bradley at his home in Massachusetts via fax on August 30, 1993. On September 1, 1993, Bradley sent to Lord certain significant "adjustments," including most notably a proposal that Bradley associates should participate in ten percent of Dean Witter's financial services position before a return on guarantee funds. Bradley telephoned Lord at some point thereafter seeking agreement on his proposed increase in the proposed percentage of the CFADS that would be the basis for his incentive fee.

On September 7, 1993, Bradley and Lord orally agreed to modify the incentive fee proposal stated in the written concepts memo (Brad.Aff. ¶¶ 11–12; Brad.Aff. Ex. 5). Under the revised fee structure, which was sent to Bradley from Dean Witter by fax, Bradley Associates was to receive ten percent of the CFADS for the first five years through 1998, and then five percent thereafter. The one-page "pro forma" that purportedly represents these agreed-upon numerical revisions, is entitled "Bradley Incentive Calculations," and is the last written communication sent by Dean Witter to Bradley in regard to the incentive fee. From Bradley's vantage, negotiations stopped on September 7, 1993 because the parties had reached a final agreement on the essential terms of an incentive fee.

Bradley contends that after receiving the revised figures he spoke with Lord and on the telephone and Lord told him that, since a basic agreement had been reached the "fine points" could be worked out and incorporated into a formal document at a later date. (Brad.Aff.¶ 11–13).

On July 25, 1994, Bradley wrote a memo to Lord and Hardman stating that he "would like to focus on the attached incentive fee proposal" of 8/27/93, and seeking to "finalize the discussion" of the incentive fee "as soon as possible." In a January 30, 1995 letter to Hardman, Bradley expressed pleasure at having spoken with Hardman about the status of the hotel, and stated that, in light of the pending restructuring of the management agreement with Hyatt, "it is appropriate that you prepare a more formal document regarding the incentive structure that you, Ed, and I agreed to on 9/7/93 which calls for incentive income to Bradley Associates or my estate of 10% of owner cash flow through 1998 and 5% thereafter." No formal document memorializing the terms of the alleged incentive fee agreement was ever constructed.

### B. *Bradley's Performance*

Bradley worked for Dean Witter from July of 1993 until October of 1993 under the terms of the original consulting fee agreement. Dean Witter then extended the consulting arrangement until December of 1993, as the written contract provided. After the written contract expired, Bradley continued to work at a rate of $5,000 per month (half his initial rate) until June of 1994. (Hardman Aff. ¶ 8; Bradley Aff. ¶ 16–18). Even after the summer of 1994, when Dean Witter ceased paying Bradley any fee, Bradley rendered some services to Dean Witter in regard to its hotel investment. (Brad.Aff. 14, 16–18; Lord Dep. pp. 302–304; D'Alcomo Aff. Ex. 13).

After Bradley was retained in 1993, the hotel's performance dramatically improved. Using a Bradley Associates strategy, Dean Witter was able to enjoy smaller interest payments on the hotel's mortgage.[3] More-

---

3. The tactic involved the withdrawal of $1.5 mil-

lion from an account for furniture and equip-

over, the hotel experienced substantially increased cash flow after debt service after Bradley was consulted. Whereas the hotel's cash flow sum was negative -$576,000 in 1992 and the cash flow prediction for 1993 was a negative -$471,000, after Bradley's retention, the actual cash flow after debt service in 1993 was a positive $2,000. The improvements continued: in 1994, the actual cash flow after debt service was approximately $1,831,053 [4]; and in 1996, the hotel's after debt cash flow was approximately $2,392,726. In January of 1995, Dean Witter's management agreement with Hyatt was successfully renegotiated.

## C. *Procedural History*

On June 27, 1995, after Dean Witter expressed an unwillingness to remit any incentive fee in addition to the base wage, Bradley filed this lawsuit against Dean Witter. The complaint alleges that Dean Witter committed fraud in representing that it would pay Bradley an incentive fee (Count I); that Dean Witter has engaged in unfair and deceptive business practices (Count II); that Dean Witter breached both its contractual obligation to pay the additional fee and the implied covenant of good faith and fair dealing (Counts III and IV); and that Bradley is entitled to the incentive fee on account of quantum meruit (Count V), unjust enrichment (Count VI), and promissory estoppel (Count VII). Dean Witter moves for summary judgment with respect to all of Bradley's claims.

## III. *DISCUSSION*

### A. *Summary Judgment*

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's

position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). In evaluating a summary judgment motion, the court must "view the facts in the light most favorable to the non-moving party," and must "draw[ ] all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995), *cert denied*, —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996).

### B. *Breach of Contract (Count III)*

The breach of contract claim is the gravamen of Bradley's complaint. Defendant Dean Witter concedes that there is a factual dispute as to whether the parties ever reached a binding agreement regarding the payment of an incentive fee; however, it contends that summary judgment is appropriate on the contract claim because New York's Statute of Frauds bars any oral incentive fee agreement between Dean Witter executives and Bradley, as well as any agreement based on written memoranda made in furtherance of the fee negotiations. Bradley argues that Massachusetts's Statute of Frauds, which is less stringent than its New York counterpart, should be construed to govern the alleged incentive fee arrangement. A threshold task in evaluating Dean Witter's statute of frauds defense is determining which state's statute is applicable to the alleged contract.

#### 1. *Choice of Law*

"A federal court in an action based on diversity must resolve conflict of law issues by applying the conflict of law rules prevailing in the state in which it sits." *Shinberg v. Bruk*, 875 F.2d 973, 975 (1st Cir.1989) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)). Massa-

---

ment that Hyatt maintained at the hotel and the use of this money to reduce principal and restore Dean Witter's mortgage debt.

4. Dean Witter's profit and loss statements indicate that the actual cash flow *before* debt service in 1994 was $3,487,500.

chusetts has adopted a "functional" approach to the conflict-of-law issue: courts "determine the choice-of-law question by assessing various choice-influencing considerations" including "the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985) [5] It is well-established that "[u]nder the functional approach, the forum applies the substantive law of the state which has the more significant relationship to the transaction in litigation." *Hendricks & Assoc., Inc. v. Daewoo Corp.*, 923 F.2d 209, 213 n. 3 (1st Cir.1991).

██ Although a consideration of the relevant factors indicates that the choice-of-law question in this case is a close one, on balance, it appears that New York has a more significant relationship to the alleged incentive fee agreement than does Massachusetts. Dean Witter Growth Properties has its principal place of business in New York, and plaintiff Bradley traveled to New York initially to meet with Dean Witter executives and to conduct the only face-to-face discussion of the proposed incentive fee. Moreover, both the alleged oral agreement and the memoranda upon which Bradley relies in claiming that an incentive fee agreement was reached originated from Dean Witter's New York offices. Although it is true that Bradley was stationed in Massachusetts and, thus, much of his work was done here, the actual subject of the consulting arrangement is located in Florida. Most significantly, the parameters of Bradley's compensation for his work in regard to the Florida hotel—including the scope of the incentive fee negotiations—were set forth in the initial consulting contract between the parties, a document that stated that "the construction, interpretation and performance of this Agreement shall be governed by the laws of the state of New York." Although the evidence demonstrates that the alleged oral fee agreement was a separate contract, rather than a modification of the July 20 agreement, the intent of the parties is a significant factor. *See Ahern v. Scholz*, 85 F.3d 774, 781 n. 3 (1st Cir.1996) (holding that Massachusetts courts honor parties' choice-of-law provisions in the absence of a public policy conflict) (citations omitted).

For the foregoing reasons, New York's statute of frauds is deemed to be the substantive law that governs the alleged incentive fee agreement. *Cf. Computer Systems of Amer. v. Int'l Business Machines Corp.*, 795 F.2d 1086, 1092 (1st Cir.1986) (upholding lower court's application of Texas's statute of frauds where "the critical letter.. was written in Texas and sent from that state" and, overall, Texas had more significant contacts with the contract than Massachusetts).

2. *Statute of Frauds Defense*

New York's Statute of Frauds requires certain agreements to be in writing and signed by the party to be charged if they are to be enforceable. *See* N.Y.Gen.Oblig.Law § 5–701(a) (McKinney 1996).[6] Dean Witter contends that the alleged oral agreement regarding payment of an incentive fee is not enforceable per New York's statute because:

---

**5.** Massachusetts has adopted the conflict-of-law factors that are set forth in the Restatement (Second) of Conflicts of Law (1971). *See Computer Sys. of Amer., Inc. v. Int'l Business Machines Corp.*, 795 F.2d 1086, 1092 (1st Cir.1986). Section 6 of the Restatement (Second) provides: "When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and, (g) ease in the determination and application of the law to be applied." Section 188(2) states that, "[i]n the absence of an effective choice of law by the parties, the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to the issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and, (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

**6.** Section 5–701, which is entitled "Agreements Required to be in Writing," requires that certain "agreement[s], promise[s] or undertaking[s] [are] void, unless [they] or some note or memorandum

(a) the incentive fee arrangement by its terms is not performable within one year, and (b) the underlying contract is "a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein." N.Y.Gen.Oblig. § 5–701(a)(1), (a)(10).

■ The first of these contentions is without merit. The parties allegedly agreed not only to a graduated incentive fee payable over time but also, alternatively, to a lump sum if the property was sold during the incentive period [7]—a condition that could have occurred within one year of the alleged oral agreement. *See Goldberg v. Select Industr. Inc.*, 202 A.D.2d 312, 609 N.Y.S.2d 202, 203, (1994) (finding that the statute bars only those oral agreements that "by 'their very terms have absolutely no possibility in fact and law of full performance within one year' " (quoting *D & N Boening v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 454, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984))).

However, insofar as Bradley was to be compensated for his assistance in restructuring the first mortgage and in negotiating new financing for the hotel, the alleged incentive fee agreement still falls within the ambit of New York's Statute of Frauds. *See* N.Y.Gen.Oblig. § 5–701(a)(10). In order to satisfy the statute, Bradley must produce a signed writing that is sufficient to memorialize the incentive fee agreement.

■ Bradley argues that the Concept Memo and the document entitled "Bradley Incentive Fee Calculations," both of which were sent to him by Dean Witter via fax, constitute such a writing. Under New York law, "a memorandum sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement." *Morris Cohon & Co. v. Russell,* 23 N.Y.2d 569, 297 N.Y.S.2d 947, 952–53, 245 N.E.2d

712, 715 (1969). While "a memorandum sufficient to satisfy the Statute of Frauds need not be contained in a single document," it is well-established that among the "combination of signed and unsigned documents, letters or other writings ... at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged." *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 822, 248 N.E.2d 576, 579 (1969) (quoting *Crabtree v. Elizabeth Arden Sales Corp.,* 105 N.Y.S.2d 40 (N.Y.Sup.Ct.1951)).

■ Drawing all reasonable inferences in favor of Bradley, who testified that Lord and he orally agreed to the August proposal as modified by the September pro forma, this Court concludes that the proffered writings—the Concept Memo and the document with updated calculations—when taken together are sufficient to create a genuine issue of material fact as to whether they set forth the material terms of the alleged incentive fee agreement.

■ Bradley mounts the next statute of frauds hurdle less easily. The statute of frauds would bar Bradley's contract claim if none of the writings upon which the claim is based are signed by Dean Witter, the party against which enforcement is sought. In this case, the first page of the August 30 and September 7 facsimile is missing. However, Bradley has submitted an affidavit stating that the missing page was a cover sheet containing the names of Ed Lord and Dean Witter. (Bradley Aff. ¶¶ 6, 9).[8] Although the New York Court of Appeals has established that "automatic imprinting, by a fax machine, of the sender's name at the top of each page transmitted" does not satisfy the signature requirement for the purpose of the statute of frauds, *see Parma Tile Mosaic & Marble Co., Inc. v. Short,* 87 N.Y.2d 524, 640

thereof be in writing, and subscribed by the party to be charged."

7. In a section of the Concepts Memo entitled "Other Incentive Proposals," Dean Witter provides that the incentive fee will be calculated and disbursed in April of each year, but that "[i]n the event of a property sale, during the five-year incentive period, Bradley Associates will receive

a final payment equal to 5% of the net sale proceeds to Yield Plus" minus all sale expenses, commissions, payments of principal and management agreement termination expenses.

8. The automatic imprint line, which labels the first page of the existing faxed documents as "page 2," supports an inference that the documents contained an initial cover page.

N.Y.S.2d 477, 663 N.E.2d 633, 634 (1996), no New York court has found that a handwritten or typed name on a fax cover page cannot constitute a sufficient subscription. It is well established that a signature for the purpose of the statute of frauds can be a written, printed, or typed name, a letterhead or billhead, or even a symbol, so long as the mark is "inserted or adopted with an intent, actual or apparent, to authenticate a writing." *Parma Tile*, 87 N.Y.2d at 527, 640 N.Y.S.2d 477, 663 N.E.2d 633 (quoting *Mesibov, Glinert & Levy v. Cohen Bros. Mfg. Co.*, 245 N.Y. 305, 157 N.E. 148 (1927)); *accord La Mar Hosiery Mills, Inc. v. Credit & Commodity Corp.*, 28 Misc.2d 764, 768, 216 N.Y.S.2d 186 (City Ct.1961); *In re Romaniw's Will*, 163 Misc. 481, 296 N.Y.S. 925 (N.Y.Sur.1937); Restatement (Second) of Contracts § 134 & cmt. a (1979) (citing U.C.C. § 1–201(39)).

Plaintiff has produced sufficient admissible evidence that the names on the missing cover page were intended to authenticate the contents of the faxed writings to withstand a motion for summary judgment on statute of fraud grounds. *Cf. Luckel v. Kolinsky*, 160 A.D.2d 1172, 554 N.Y.S.2d 374, 375 (1990) (finding "a serious factual dispute" with regard to whether a destroyed document was sufficient to satisfy the statute of frauds). *But cf. Birenbaum v. Option Care, Inc.*, No. 05–95–01088–CV, 1997 WL 217629, —— S.W.2d —— (Tex.App. May 2, 1997) (holding that a signature on a post-it note Fax Transmittal Memo "is not evidence from which the trial court could infer" an intent "to authenticate the document as the agreement of the parties").

Alternatively, plaintiff contends that the statute's writing obligation is excused by Bradley's continued performance after the termination of the formal agreement in December 1993. *See Sarcona v. De Giaimo,* 226 A.D.2d 1143, 641 N.Y.S.2d 479, 481 (1996) (finding summary judgment inappropriate where there is a factual issue regarding partial performance). Whether Bradley labored at half his regular rate after December of 1993, and then for no compensation after June of 1994, in reliance on the alleged incentive fee agreement is an issue that is in dispute in this case and that is material to the statute of frauds determination. *See Cunnison v. Richardson Greenshields Securities, Inc.*, 107 A.D.2d 50, 485 N.Y.S.2d 272, 276 (1985) (allowing the excuse of partial performance to defeat the statute of frauds where services are "unequivocally referable to the [unwritten] agreement").

Because Dean Witter's statute of frauds defense cannot be resolved solely as a matter of law, its motion for summary judgment in regard to the breach of contract claim must be **DENIED**.

### C. *Implied Covenant of Good Faith and Fair Dealing (Count IV)*

 "Implied in every contract is a covenant of good faith and fair dealing, which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Jaffe v. Paramount Communications Inc.*, 222 A.D.2d 17, 644 N.Y.S.2d 43, 47 (1996). Bradley claims that, by failing to complete the incentive fee agreement, Dean Witter breached the implied covenant of good faith and fair dealing that existed in the written contract of July 20, 1993. Even when the facts are viewed in the light most favorable to Bradley, this argument fails as a matter of law.

In the first place, Bradley explicitly concedes that "[t]here is uncontroverted evidence that Dean Witter engaged in bargaining with Bradley over the incentive fee." Bradley has not offered any evidence to show that Dean Witter acted arbitrarily, capriciously, or in bad faith at any point during these negotiations. Second, under the terms of the July 20, 1993 contract, Bradley had not been given any *right* to an incentive fee. Indeed, the contract specifically provided that "if the parties are unable to agree on an acceptable incentive fee, this Agreement shall terminate and Dean Witter shall not be obligated to pay Bradley any incentive fee." ¶ 4(b). The failure to arrive at an acceptable incentive fee arrangement was expressly contemplated by the parties to the consulting contract, and the mere cessation of negotia-

tions does not deprive Bradley of the benefits of his bargain in a manner that is redressible by an action for breach of the implied covenant.

There being no genuine issue of fact as to whether Dean Witter breached the implied covenant of good faith and fair dealing contained in the July 20th contract, defendant's motion for summary judgment on this claim is *ALLOWED*.[9]

### D. *Fraud (Count I)*

 Bradley claims that Dean Witter made false representations to him during the incentive-fee negotiations regarding its intention to pay him an amount in addition to the base fee. Although Bradley contends that Massachusetts's law should apply to his fraud claim and Dean Witter urges the Court to apply the law of New York, this Court finds that it need not resolve the alleged choice-of-law issue in this context because, on the facts of this case, there is no distinction between the law of New York and Massachusetts that is material to the resolution of Dean Witter's motion for summary judgment on Bradley's fraud claim. Under either state's law, a claim of material misrepresentation requires that the defendant make a promise to do something in the future without the present intent to fulfill that promise. *See Shlang v. Bear's Estates Dev. of Smallwood*, 194 A.D.2d 914, 599 N.Y.S.2d 141, 143 (1993) (holding that a fraudulent misrepresentation claim must be based on "misstatements of material fact or promises made with a present, albeit undisclosed, intent not to perform them"); *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 226 (D.Mass.1990) (finding that "the present intent, or state of mind, of the defendant at the time the promises were made becomes the relevant issue" when the fraud claim is based on a promise to act in the future); *Barrett Associates Inc. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867, 868 (1963) (finding that "it is a misrepresentation

of a material fact" when there is no present intent to fulfill a promise at the time it is made). "The mere fact that the expected performance was not realized is insufficient to demonstrate that defendant falsely stated its intentions." *Laing Logging Inc. v. Int'l Paper Co.*, 644 N.Y.S.2d 91, 93 (N.Y.App.Div. 1996). Bradley has offered no evidence from which a jury could reasonably infer that Dean Witter fraudulently misrepresented its intention to pay him an incentive fee during the negotiations in August and September of 1993. Accordingly, Dean Witter's motion for summary judgment on Bradley's fraud claim is *ALLOWED*.

### E. *Massachusetts General Laws, Chapter 93A (Count II)*

Bradley has brought a claim against Dean Witter based on Massachusetts's Consumer Protection Act, M.G.L. Chapter 93A § 2, which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." As an initial matter, this Court must address the applicability of the Massachusetts Consumer Protection Act in a case where New York has already been deemed to have the most substantial relationship to the contract in dispute.

 A defendant may be liable under G.L. c. 93A for its conduct in Massachusetts even if the underlying contract is governed by the laws of another state. *See, e.g., Computer Sys. Eng., Inc. v. Qantel Corp.*, 740 F.2d 59, 70–71 (1st Cir.1984), *aff'ing* 571 F.Supp. 1365 (D.Mass.1983); *see also Worldwide Commodities, Inc. v. J. Amicone Co., Inc.*, No. 9107, 1991 WL 225938, at *3 (Mass. App.Div. Oct. 22, 1991). The critical factor in determining the applicability of 93A is whether the unfair and deceptive claim is based on conduct that is intertwined with the contract that is governed by another state's law. *See Northeast Data Sys. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607,

---

9. The defendant would also be entitled to summary judgment if the good faith and fair dealing claim was based on the alleged incentive fee agreement itself. Having allowed the plaintiff's breach of contract claim to proceed, *see supra* Section A, a claim for breach of the implied covenant of good faith and fair dealing that

arises out of the same contract is redundant as a matter of law. *See OHM Remediation Servs. Corp. v. Hughes Environ. Sys.*, 952 F.Supp. 120, 124–125 (N.D.N.Y.1997) (dismissing good faith claim as duplicative of breach of contract claim on the basis of well-established precedent).

609 (1st Cir.1993); *Jacobson v. Mailboxes Etc U.S.A., Inc.*, 419 Mass. 572, 579–80, 646 N.E.2d 741, 745–46 (1995); *see also BNY Fin. Corp. v. Fitwel Dress Co., Inc.*, No. Civ.A.95–4785A, 1997 WL 42518 (Mass.Sup. Ct. Jan. 15, 1997) (holding that a contractual choice-of-law provision selecting New York law will bar a 93A claim if the allegedly unfair trade practices "amount, in substance, to 'embroidered breach of contract claims'" (quoting *Northeast Data Sys.*, 986 F.2d at 609)). Here, Bradley's 93A claim arises out of Dean Witter's alleged breach of promise to pay an incentive fee as an inducement for Bradley's continued work at a reduced rate beyond the period covered by the written agreement executed on June 20, 1993. Because the unfair and deceptive conduct alleged is qualitatively distinct from the contractual agreement, this Court finds that the applicability of New York law to the contract claim does not preclude a claim for unfair and deceptive business practices under Massachusetts law.

Appearing to concede that Bradley can launch a consumer protection challenge under Massachusetts law, Dean Witter makes two specific arguments in support of its motion for summary judgment on Bradley's Chapter 93A count. First, Dean Witter argues that the "unfair and deceptive" business practices claim alleges a simple breach of a promise to pay the incentive fee without the immorality required by Massachusetts courts. Second, Dean Witter contends that it is exempted from liability under the Consumer Protection Act because the challenged conduct did not occur primarily and substantially in Massachusetts. Dean Witter is mistaken on both counts.

■■■ It is true that "mere breaches of contract, without more, do not violate chapter 93A." *Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985) (citing *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 251 (1979)). Massachusetts courts have long held that, in order to fall within the ambit of the Consumer Protection Act, " '[t]he objectionable conduct must attain a level of rascality'" that

renders it "immoral, unethical, oppressive, or unscrupulous.' " *Quaker State Oil Refining v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979) and *PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). Bradley has successfully raised the specter of unethical conduct within the meaning of Chapter 93A by alleging that Dean Witter coaxed him into working at a significantly reduced rate of compensation for several months after the original consulting agreement ended with the mutual understanding that Bradley would be rewarded by an incentive fee if the hotel were successful. *See, e.g., Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 474–76, 583 N.E.2d 806 (1991). Even though a factfinder may determine that there was no enforceable agreement over the essential terms of a contract, Bradley's assertion that the defendant subsequently persuaded him to lower his regular rates with the lure of an incentive fee, and that it subsequently refused to pay him the promised fee because the hotel was so profitable, may support a claim for unfair business practices that is separate from the alleged contract breach and that is indicative of the requisite "rascality." *See id.* (finding that conduct "in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes") (citations omitted).

■■■ Moreover, this Court rejects Dean Witter's assertion that the allegedly objectionable conduct occurred outside of Massachusetts within the meaning of the consumer protection statute. In *Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662, 672 (1985), the Supreme Judicial Court set forth three factors to use in the determination of whether the challenged acts took place "primarily and substantially in Massachusetts" as required by statute: (1) where the alleged conduct took place, (2) where the plaintiff received and acted upon the statements, and (3) where the plaintiff's losses were suffered.[10] Only the first factor

---

10. It should be noted that this three-factor test is more succinct than the general "functional" approach that Massachusetts courts apply when deciding choice-of-law issues. *See Bushkin*, 473

weighs in favor of Dean Witter's argument that it is not subject to 93A liability. Because Bradley received and acted upon the statements in Massachusetts, and his losses were suffered here, Dean Witter's allegedly unfair acts can be deemed to have occurred "primarily and substantially in Massachusetts" for the purposes of the Consumer Protection Act.

For the foregoing reasons, Dean Witter's motion for summary judgment on Bradley's Chapter 93A claim is *DENIED.*

### F. *Other Claims*

■ Finally, Dean Witter contends that it is entitled to summary judgment in regard to Bradley's claims for quantum meruit (Count V), unjust enrichment (Count VI), and promissory estoppel (Count VII). The defendant's argument ignores the record evidence that indicates a triable fact issue as to whether Bradley continued to work for Dean Witter either without compensation or at reduced rates of compensation after the initial written contract had expired. This evidence raises clear, triable issues of fact as to: (1) whether Bradley's continued assistance was made in good faith and with a reasonable expectation of compensation, *see Clark v. Torian,* 214 A.D.2d 938, 625 N.Y.S.2d 370, 371 (1995); *Mass Cash Register v. Comtrex Sys. Corp.,* 901 F.Supp. 404, 424 (D.Mass.1995) (quantum merit); (2) whether Dean Witter received a benefit from that additional, unpaid performance which it is not entitled to retain "in equity and good conscience," *Mayer v. Bishop,* 158 A.D.2d 878, 551 N.Y.S.2d 673, 674 (1990); *accord Salamon v. Terra,* 394 Mass. 857, 859—60, 477 N.E.2d 1029, 1031–32 (Mass.1985) (unjust enrichment); and (3) whether Dean Witter made a clear promise regarding the incentive fee upon which Bradley reasonably relied in continuing to work beyond the contractual period, *see R. Freedman & Son, Inc. v. A.I. Credit Corp.,* 226 A.D.2d 1002, 641 N.Y.S.2d 429, 430

(1996); *Pressman v. Brigham Med. Group Foundation, Inc.,* 919 F.Supp. 516, 525 (D.Mass.1996) (promissory estoppel).

Because issues of fact that are material to Bradley's claims for quantum meruit, unjust enrichment, and promissory estoppel exist, Dean Witter's motion for summary judgment with regard to Counts V, VI, and VII of Bradley's complaint is *DENIED.*

### IV. *ORDER*

Defendant's Motion for Summary Judgement (Docket 19) is *ALLOWED* with regard to Counts I and IV, and is *DENIED* with regard to Counts II, III, V, VI and VII.

---

N.E.2d at 672. Courts have found that the functional approach may also be appropriate in deciding whether a transaction has occurred primarily and substantially within Massachusetts for the purposes of Chapter 93A. *See Clinton Hospital Ass'n v. Corson Group, Inc.,* 907 F.2d 1260, 1266 (1st Cir.1990). However, where, as

here, a court seeks only to determine the reach of Chapter 93A, and there is no battle between the consumer protection laws of different jurisdictions, the limited, three-factor approach is sufficient. *See, e.g, Roche v. Royal Bank of Canada,* 109 F.3d 820, 829–31 (1st Cir.1997).