COMMERCIAL UNION INSURANCE COMPANY, As Successor in Interest to Employers' Surplus Lines Insurance Company, Plaintiff,

v.

SEVEN PROVINCES INSURANCE COMPANY, LTD., Defendant.

No. 95–10894–NG.

United States District Court, D. Massachusetts.

June 15, 1998.

---

Bruce M. Friedman, Kroll & Tract, New York, NY, Thomas J. Hogan, Kroll, Rubin & Fiorella LLP, Boston, MA, for Commercial Union Insurance Company.

Brian A. Davis, Kurt Wm. Hemr, Choate, Hall & Stewart, Boston, MA, Ralph Phalen, H. Northcraft, Mark V. Dugan, Blackwell, Sanders, Matheny, Weary & Lobardi P.C., Kansas City, MI, for Seven Provinces Insurance Company, Ltd.

## MEMORANDUM

GERTNER, District Judge.

A trial was held in this action to recover on a policy of reinsurance. The dispute arises out of a reinsurance arrangement entered into thirty-five years ago between Employers' Surplus Lines Insurance Company("ESLIC") and defendant Seven Provinces Insurance Company, Ltd. ("Seven Provinces"). ESLIC insured Teledyne, a California-based manufacturing company, through a number of different insurance policies. In 1963, ESLIC ceded a portion of the Teledyne risk covered by one of those policies to Seven Provinces.

In 1982, environmental contamination was discovered at a number of Teledyne sites. The company was faced with third-party suits and Environmental Protection Agency ("EPA") claims for millions of dollars in clean-up costs. It submitted a claim to its insurers, including ESLIC's successor-in-interest, plaintiff Commercial Union ("CU"). CU's obligations to Teledyne under various policies and for various contaminated sites were litigated in California and eventually settled. Under the terms of the settlement, CU paid Teledyne $2.2 million and Teledyne released CU from all future liability for any environmental claims against Teledyne.

According to CU, one site in particular was the focus of negotiations: the "semiconductor site," where Teledyne had carried on manufacturing activity since 1962, and for which clean-up costs were estimated to be $20.93 million. ESLIC had insured Teledyne the year after the site began operations, from July 1, 1963 to July 1, 1964, under a general liability policy that covered losses in excess of $50,000 and up to $1.95 million. CU allocated $843,000 of the $2.2 million to that site and billed its reinsurers accordingly. All loss in excess of $500,000 was covered by a reinsurer not a party to this case. Of the remaining $450,000, CU billed half, or $225,-000, to Seven Provinces. It then billed $180,-000 of its half of the risk to a pool of treaty reinsurers, leaving CU itself to absorb only $45,000 of the loss.[1]

CU brings this suit in order to recover the $225,000 it billed Seven Provinces, as well as damages and attorneys fees under Mass. Gen. L. ch. 93A, for Seven Provinces' failure to satisfy this claim for over four years. CU bases its claim for $225,000 in reinsurance on its internal records of the reinsurance relationship between the parties and on the facultative certificate [2] ("fac. cert.") formalizing that relationship. It bases its claim for 93A damages in part on the unique mores of the

---

1. Treaty reinsurance involves the pooling of all policies covering a particular type of risk—such as all property damage, all liability insurance, or all earthquake insurance—among a group of insurers, each of whom agrees to cover a certain portion of all claims of that type. The treaty pool is defined by the type of risk, not as in facultative reinsurance, by the identity of the insured of one particular policy.

2. Facultative reinsurance is reinsurance on a portion of one particular, identified risk, in this case, on 50% of the liability policy between ESLIC and Teledyne in force from July 1963 to July 1964. "Facultative certificate" is the reinsurance industry term for the written record of a facultative insurance contract.

industry, notably the obligation of "uberrimae fidei," the obligation to act with utmost good faith. *See Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 944 F.Supp. 986, 992–94 (D.Mass. 1996).

Seven Provinces raises several defenses to this claim. (1) *The net retention claim:* Seven Provinces argues primarily that the facultative certificate links its reinsurance obligation to the amount of risk ESLIC (now Commercial Union) retained. Because $180,000 of ESLIC's $225,000 portion of the Teledyne risk was covered by a pool of treaty reinsurers, Seven Provinces' obligation was reduced by equal measure, to $45,000. (2) *The allocation claim:* Seven Provinces has also raised a range of challenges to CU's decision to allocate $843,000 of the $2.2 million Teledyne settlement to the semiconductor site: that it was not done in good faith; that it wrongly billed reinsurers for *ex gratia* payments, not required by the insurance policies that had been settled, but instead given voluntarily in order to obtain the general release from all future claims; that it failed to allocate any payments to a "difference in conditions"—essentially, property damage—policy ESLIC had issued to Teledyne; and that the entirety of Teledyne's claim against CU was barred by the "owned property" exclusion in the ESLIC–Teledyne policy reinsured by Seven Provinces. (3) *The 93A Claim:* Seven Provinces argues in part that the mores of the reinsurance industry have changes and its behavior conforms to 1990s standards.

The Court heard six days of testimony and admitted numerous pages of exhibits documenting the relationship between the parties and between CU, ESLIC, and Teledyne. Specifically, several years of correspondence between the parties about the Teledyne claim were authenticated and made part of the record. Each side offered the testimony of the officers directly involved in this dispute, as well as of an expert in the customs and practices of the highly specialized world of reinsurance.

This memorandum provides my findings of fact and conclusions of law in my resolution of all of CU's claims against Seven Provinces.

## I. FINDINGS OF FACT

### A. The Formation of the Reinsurance Relationship

The background to the formation of the reinsurance relationship between Seven Provinces and ESLIC is undisputed. During the early 1960s, both ESLIC and Seven Provinces operated in California through a managing general agent, Sayre & Toso. Sayre & Toso was authorized to write insurance and reinsurance business for ESLIC, Seven Provinces, and several other insurance companies. On October 29, 1963, it wrote a policy of reinsurance between ESLIC and Seven Provinces, memorializing that relationship in a facultative certificate, # SP016069. The facultative certificate was made up of a series of numbered, standardized forms. The first page of the certificate was a Seven Provinces' form and the number beginning "SP" indicates "Seven Provinces," making Seven Provinces technically the drafter of the agreement.

By the terms of the facultative certificate, the reinsurance relationship with Seven Provinces covered the ESLIC policy with Teledyne, policy # E506432, for the same period as the underlying policy, from July 1, 1963 to July 1, 1964, and on the same risks. The ESLIC policy with Teledyne was a general liability policy, covering risks in excess of $50,000 and up to $1,950,000. As a liability policy, it excluded coverage for damage to property owned by Teledyne. ESLIC had obtained reinsurance for all losses above $500,000 from another reinsurer, listed as "Brandt" in CU's records.[3] Of the remaining $450,000 of risk it retained, ESLIC ceded $225,000 to Seven Provinces. Thus, by the express terms of the facultative certificate, Seven Provinces agreed that should Teledyne make a claim against ESLIC for $450,0000 under the ESLIC–Teledyne liability policy,

---

**3.** CU officers testified at trial that they have been unable to fully identify or locate this company. In any event, neither party argues that its existence has any affect on the CU–Seven Provinces relationship.

Seven Provinces would in effect reimburse ESLIC for half its loss.

However, Seven Provinces' obligation was not unconditional; it was qualified by a "net retention" provision. After setting out the amount of reinsurance and the nature of the risk reinsured, the last page of the certificate contained the following paragraph 2:

[1] Being a reinsurance of and warranted same **NETT**[4] rate, terms and conditions as and to follow the settlements of the **EMPLOYER SURPLUS LINES INSURANCE COMPANY** and that the local office of the said Company retains during the currency of this insurance at least $225,000.00 **BEING 50% OF $450,000.00 EXCESS $50,000.00 COMBINED SINGLE LIMIT** ( [2] subject to reduction by any general excess loss or excess catastrophe reinsurance whether effected by the head office or local office of the Company) [3] on the identical subject matter and risk and in identically the same proportion on each separate part thereof, but [4] in the event of the retained line being less than as above, Underwriter's lines to be proportionally reduced.[5]

This clause, it is agreed, required the "local office" to retain for ESLIC's account 50% of the Teledyne risk covered by the ESLIC–Seven Provinces policy, and ceded the other 50% to Seven Provinces. Whether it restricted ESLIC's head office at all, and if so, in what ways, is at the heart of this dispute. Seven Provinces claims that this clause required ESLIC to retain the entirety of its 50% of the Teledyne risk for its own account. If it reduced its risk by obtaining any further reinsurance, Seven Provinces' responsibility under the contract would be proportionately reduced as well. Because CU admits that $180,000 of the Teledyne risk was covered by a treaty reinsurance pool, Seven Provinces argues that its liability is also reduced by $180,000. It now owes CU $45,000, at the most.

CU argues that this clause bound only the "local office" or its functional equivalent, ESLIC's managing general agent Sayre & Toso. Only if Sayre & Toso obtained facultative reinsurance on the ESLIC–Seven Provinces policy, it argues, would Seven Provinces' responsibility be reduced. · If the ESLIC's main office obtained facultative reinsurance, or if either office obtained treaty reinsurance, Seven Provinces' responsibility would remain the same: the $225,000 CU is seeking in this action.

## B. *The Net Retention Clause*

I find that a reinsurance relationship existed between the parties. It is documented in the facultative certificate, which is of undisputed authenticity.

I find that the express terms of the facultative certificate provided for the cession of $225,000 of the Teledyne risk to Seven Provinces.

I find that the language of paragraph two is ambiguous at several key points:

(1) Does the phrase "[b]eing a reinsurance of and warranted same NETT rate, terms and conditions as and to follow the settlements of [ESLIC] and that the local office ... retains ... at least $225,000 ..." (phrase [1] ) contain a warranty as to the amount of risk ESLIC agreed to retain, or did the phrase address something else, namely, that the "NETT rate, terms, and conditions" of the reinsurance relationship would be the same as that of the underlying insurance policy between ESLIC and Teledyne? Put otherwise, does the warranty clause in any way guarantee the amount of risk ESLIC would retain?

(2) When the clause refers in phrase [2] to the reinsurance ESLIC was permitted to obtain, which types of reinsurance are covered? Do the words "any general excess loss or excess catastrophe reinsurance" include treaty reinsurance, the kind ELSIC actually obtained?

(3) Does the parenthetical phrase at [2], that the retained amount is "subject to reduction," create an exception to the propor-

---

**4.** As the plaintiff's expert, Dr. Robert Gottheimer, testified at trial, this is a British spelling of "net" which means "net of commission paid to an agent or broker."

**5.** The bracketed numbers are not in the original text.

tional reduction provision at [4], such that any reduction in ESLIC's retained risk by means of "general excess loss or excess catastrophe reinsurance" did not affect Seven Provinces' obligations? Or, alternatively, does it list forms of reinsurance that, while they would not constitute a breach of the net retention warranty, nonetheless, by reducing the retained line to an amount less than "as above," trigger the proportional reduction provision?

These ambiguities could not be resolved at trial through testimony from the parties who entered into the agreement. Although each party testified to the meaning of the relevant provisions, neither was able to call or even identify the Sayre & Toso agent who drafted this agreement thirty-five years ago. Sayre & Toso itself has since gone out of business.

 I do not find it appropriate to construe all of the ambiguities in the document against the drafter. Although the first page of the certificate bears the name of Seven Provinces, both parties acknowledged that the certificate was made up of a series of standardized forms routinely used by Sayre & Toso, who was at the time the agent of each.[6] As CU's expert, Dr. Robert Gottheimer, testified, the separate pages could have been drafted by any one of the several companies Sayre & Toso represented. Only the sections in bold and capital letters were completed at the time the relationship was formed, and they do not contain any of the language that is in dispute.

Given the ambiguity of the fac. cert. language, and the lack of any witnesses to the formation of the agreement, each side offered expert testimony interpreting the agreement in the light of the custom and practice of the reinsurance industry. CU offered the testimony of Dr. Robert Gottheimer ("Gottheimer"), a professor at the College of Insurance in New York who has been working in the insurance industry since 1953 and in reinsurance since 1964. Seven Provinces offered that of Austin Thornton ("Thornton"), who has worked in the insurance industry since 1975 and has published an article on the perils of CERCLA liability claims.

### 1. *Gottheimer's testimony*

Gottheimer testified that the facultative certificate did not restrict ESLIC's right to obtain treaty reinsurance. The "warranty" phrase [1], he explained, only warranted the policy's "rates, terms, and conditions," not the net retention figure. With respect to the net retention language ([2] and [4]), he offered three linguistic explanations of why it did not provide for the reduction of Seven Provinces' obligations in the event that ESLIC obtained *treaty* reinsurance. First, because the custom and practice of the industry has long been for the reinsured to have the right to obtain treaty reinsurance on a facultatively reinsured risk, industry practice is to use unequivocal language when an absolute bar on such additional reinsurance is intended. The customary language to indicate such an absolute bar would have included the phrase "absolute net," a statement that "only" a particular kind of treaty reinsurance, such as excess loss, was allowed, or a description of the risk as "not reinsured in any other way." None of that language appears here.

Second, Gottheimer testified that the proportional reduction provision could only refer to facultative reinsurance because it refers to insurance "on the identical subject matter and risk and in identically the same proportion."[3] Treaty reinsurance by definition covers an entire class of the reinsured's business, all of its liability insurance, for example, or all of its earthquake insurance. Only facultative insurance, which reinsures one particular risk, can be "on the identical risk."

Third and finally, Gottheimer testified that the parenthetical at [2] ("general excess loss or excess catastrophe reinsurance"), which purports to describe the allowable types of reinsurance, while unusual, most likely includes treaty reinsurance. He testified that it reflects British and European rather than United States usage, according to which the phrase "general reinsurance" refers to treaty reinsurance. He acknowledged that the punctuation of the phrase—without a comma between "general" and "excess loss"—appeared to refer to "general excess loss" and

---

6. Gottheimer testified that this was not uncom- mon in the industry at that time.

"general excess catastrophe" reinsurance, not to "general reinsurance, excess loss reinsurance, and excess catastrophe reinsurance." Nonetheless, he believed that the reference to general reinsurance, however configured, could only be a reference to treaty reinsurance.

Gottheimer reinforced his textual interpretation with a policy explanation. A net retention provision, he explained, is meant to create an incentive for the underwriter to investigate carefully the business it writes. A reinsurer does not itself evaluate the quality of the risk it is reinsuring. Instead, it must rely on the reinsured's underwriting judgment. If the reinsured could cede all of the risk to reinsurers, it would have no incentive to exercise that judgment carefully, because it would bear none of the consequences of underwriting bad risks. These incentives simply do not apply, however, when the reinsurance in question is treaty reinsurance. In that case, the reinsurance covers an entire class of business and cannot affect the incentives to evaluate any particular risk carefully.

Finally, Gottheimer testified that the separate functions of the local agent and the head office raise a practical barrier to the drafting of a facultative certificate that would reduce the reinsurer's obligation if the head office carried treaty reinsurance. Neither side to the formation of the facultative relationship at the local level would be likely to know of or have control over the conclusion of quota share treaties by the head office. Neither side, at the local level, would be likely to know the absolute amount retained. In this case, for example, it was undisputed that, while the facultative certificate was issued in October 1963, the relevant treaty reinsurance was already in effect several years before. I find it hardly likely that such uncertain obligations would have been entered into as a matter of course, using a pre-printed form such as in this case. Gottheimer's interpretation makes sense; the local office only negotiated concerning the facultative reinsurance that it would obtain, not the treaty reinsurance the head office entered into.

### 2. *Thornton's Testimony Compared*

The defendant offered the testimony of Austin Thornton, a claims director at Munich American Services Corporation with twenty-three years' experience in the insurance business. Thornton acknowledged that reasonable minds could differ as to the meaning of the retention clause in this case, but his interpretation was that ESLIC was prohibited from obtaining quota share reinsurance. "General excess loss or excess catastrophe reinsurance," he maintained, meant only "excess loss" or "excess catastrophe" reinsurance, not treaty reinsurance. Therefore, treaty reinsurance was barred, or, at a minimum, if ESLIC obtained treaty reinsurance, Seven Provinces' obligations would be reduced accordingly.

Thornton also argued that the phrase "the local office ... retains" required Sayre & Toso to maintain $225,000 for its own account. This provision, he testified, was also breached. Sayre & Toso, it was undisputed, was not a local office of ESLIC, but a managing general agent. As it was no more than a broker, it was incapable of retaining risk for its own account.

This second argument was implausible on its face. As Gottheimer testified uncontested, for reasons of state law, a number of insurers, including Seven Provinces itself, operated through managing general agents during this period in the development of the American insurance market. To maintain that this warranty provision required that such managing general agents act as local offices and maintain risk for their own account, rather than for the account of the principles they represented, would make all of the facultative certificates entered into by Sayre & Toso on this *standardized Seven Provinces form* incapable of performance *ab initio*. I decline to accept such an absurd result.

I find, moreover, that the policies behind net retention agreements would not be jeopardized by allowing managing general agents to enter into facultative reinsurance contracts, even if they were not legally configured so as to be able to retain risk for their own account. Acting as ESLIC's agent, Sayre & Toso retained the risk *on behalf of ESLIC*. The probity of its underwriting decision would directly impact ESLIC's profits. The incentive to underwrite carefully would

be maintained both by its general duties to ESLIC under agency law and, more particularly, by the industry practice, testified to by Gottheimer, of linking an agent's commission to the principal's profits.

On the issue of which types of reinsurance were permitted by the net retention clause, both Thornton's and Gottheimer's explanations were plausible. Overall, I found Gottheimer to be more credible. His explanation of the relevant language was detailed and consistent on both direct and cross examination. It accounted for all aspects of paragraph two, both in terms of the paragraph's internal logic, and in the context of reinsurance industry custom, practice, and policy. Thornton's explanation was less comprehensive; it failed to take into account, for example, the policy reasons behind treating facultative and treaty reinsurance differently, or the language referring to insurance on "the identical subject matter and risk and in identically the same proportion . . . ."

I also found Gottheimer's testimony more credible because of the extensive experience on which it was based. Gottheimer has been writing reinsurance contracts for thirty years; in fact, he was the only witness in this case who was active in the industry at the time the contract in question was formed. Although he worked in America, his experience encompassed placing business in British and global markets. He has been teaching principles of reinsurance for over twenty-five years, and has published two texts and a number of articles on reinsurance matters. One chapter in one of the texts he has written is devoted entirely to drafting facultative certificates. Gottheimer holds numerous degrees in insurance, beginning with a 1958 B.A. as an insurance major and including both a PhD in management with a focus on insurance and a specialized reinsurance degree completed as recently as 1991. He has held a number of positions in insurance industry associations over the past fifteen years and acted as an arbitrator in over 40 insurance disputes.

Austin Thornton's experience in the insurance and reinsurance industry, although not insubstantial, does not nearly approach that of Gottheimer. His insurance industry experience goes back to 1975, two decades after Gottheimer began in the business. His experience also lies almost exclusively in claims adjustment, rather than underwriting. Thus, while Gottheimer has participated for decades in the drafting of hundreds of contracts such as the one at issue here, Thornton's experience is less relevant to questions of contract formation and interpretation. Nor does Thornton share a fraction of Gottheimer's teaching, writing, educational, or industry leadership experience.

Finally, I found Gottheimer's testimony credible because of his impartiality. Although a frequent expert witness on insurance and reinsurance matters, his only connection to this dispute is as an outside expert. When questioned on cross-examination about any possible ties to the plaintiffs, he acknowledged that he had been involved in litigation with the plaintiff's counsel before—but on the opposite side. Thornton, by contrast, has been intimately involved in this dispute since early 1995, when he was hired as a consultant by Martin Rebisz ("Rebisz"), the Seven Provinces officer in charge of handling this claim. He accompanied Rebisz to CU's Boston offices to inspect CU's files, and he participated with him in meetings with CU officers and employees. Following that meeting, Thornton drafted critiques of CU's allocation that Rebisz submitted to CU in an attempt to persuade it to reduce its claim. As Rebisz testified, Thornton's employer, Munich American, has an important ongoing relationship with Seven Provinces' parent company, ING Insurance.

### 3. Summary of Fact–Findings on Net Retention

I find that the facultative certificate only provided for Seven Provinces' portion of the Teledyne risk to be reduced if ESLIC obtained facultative reinsurance on its portion of the risk. I find that the facultative certificate allowed ESLIC to carry treaty reinsurance that would cover its portion of the Teledyne risk.

Given my finding that CU was allowed to obtain treaty reinsurance, I do not need to reach the issue—vigorously argued by the parties—of whether the restrictions in the

facultative certificate covered only Sayre & Toso, leaving CU the freedom to obtain any type of reinsurance it chose. As CU was permitted to obtain the type of reinsurance it did, without any corresponding reduction in Seven Provinces' obligations, that issue is irrelevant.

I therefore find that Seven Provinces' obligation under the reinsurance relationship with ESLIC was not reduced by the existence of the CU treaty reinsurance pool.

### C. Seven Provinces' Challenge to CU's Allocation of the Teledyne Settlement

#### 1. The Allocation

Seven Provinces also challenges CU's decision to allocate $843,000 of the $2.2 million settlement to the semiconductor site and to the 1963–1964 policy year. Generally, it argues that other allocations between the various Teledyne sites and the policies that covered them would have been "more reasonable." In addition, it argues that part of the settlement should have been allocated to a "difference in conditions" policy between ESLIC and Teledyne, and that CU should not have paid Teledyne for its environmental liability because such losses were excluded from coverage by the underlying Teledyne–ESLIC policy's "owned property exclusion."

To explain the allocation of the Teledyne settlement among the ESLIC–Teledyne policies, CU offered the testimony of the two employees directly responsible for making that allocation: James J. McKay ("McKay"), an employee in the ceded (or reinsurance) department and Bryan Drees ("Drees"), his supervisor. Drees' handwritten notes, which he authenticated at trial, show that he had identified three relevant ESLIC–Teledyne policies [7] in CU's records: E–506432, the 1963–64 policy at issue in this case, E–63854,

which covered the period November 1, 1970 to November 1, 1971, and policy E–61904, which ran from March 15, 1970 to November 1, 1972. The terms of policy E–506432 have been described in detail above. On policy E–63854, ESLIC was the primary insurer, covering the first $500,000 in the first year and the first $50,000 in excess of $50,000 in the second. Policy E–61904 covered only losses in excess of $1 million dollars, with ESLIC's total liability limited to the next $1 million.

Drees' notes set out all of the insurers and reinsurers on each policy. On the 1963 policy, Drees' notes reflect CU records identifying four reinsurers and distributing the risk as follows: after the first $50,000 was paid by a primary insurer, the next $450,000 would be split equally between ESLIC and Seven Provinces; the next $500,000 in excess of $450,000 (that is, any losses between $500,000 and $1 million) would be paid by Brandt; and the last $1 million between $950,000 and ESLIC's ceiling of $1.95 million was divided between two reinsurers, Security Mutual and Employers Mutual, each of which reinsured $500,000. The notes also reveal that Security Mutual had been "liquidated years ago." Although CU did not possess the fac. cert. memorializing the reinsurance relationship with Seven Provinces, Drees relied on a card in CU's internal records, which listed the fac. cert. numbers and terms of all the reinsurance on the Teledyne policy. Drees recognized the card as a typical Sayre & Toso record.

There was also a "difference in conditions" policy between Teledyne and ESLIC, but CU did not allocate any settlement dollars to it because Teledyne had never presented it to CU for coverage. CU understood it to be inapplicable to the hazardous waste claim in any case, because it covered depreciation to Teledyne's property, buildings, or machinery, not general liability.

---

7. He also identified eight Teledyne policies with high excess of loss thresholds that were not considered implicated in the settlement discussion and the significance of which was not raised at trial: policy E4–8381006, 11/1/71–11/1/72, $3.5 million in excess of $1.5 million; E4–8381003, 11/1/70–11/1/71, $3.5 million in excess of $1.5 million in excess of the primary insurance; E4–8381004, 11/1/70–11/1/71, $13 million in excess of $5 million; E4–8381007, 11/1/71–11/1/71, $10 million in excess of $5 million; E16–8381001, 3/15/68–11/1/70, $10 million in excess of $1.5 million; E4–8381005, 11/1/70–11/1/71, $5 million in excess of $18 million; E4–8381008, 11/1/71–11/1/72, $5 million in excess of $15 million; and E16–8381002, 3/17/69–11/1/70, $14 million in excess of $10 million.

McKay and Drees explained in detail how they allocated the $2.2 million settlement between policies E–506432 and E–63854 according to their standard allocation procedures. First, Drees wrote to John Frumer ("Frumer"), CU's in-house counsel who had negotiated the settlement, requesting: "(1) the settlement amount (2) the allocation of settlement to the various sites and the logic driving such allocation (3) explanatory note regarding allocated to 'buy-back,' if applicable." As Drees and McKay explained, they believed that the only legitimate manner in which to allocate settlement dollars between policies and sites was to follow the logic of the actual settlement negotiations with the insured.

Frumer responded that seven sites had driven the settlement and two policies would be impacted. The release, he reported was a "throw in" for which no money had been exchanged. Although Drees conceded on cross-examination that a release "always has value," he added that that value cannot always be translated into monetary terms. He insisted that in allocating no settlement dollars to the release he was following Frumer's account of the actual value CU and Teledyne had assigned to the release in the course of negotiations.

McKay received this information and proceeded to allocate the entire $2.2 million settlement among ESLIC policies and their reinsurers. Because fixing the date of loss is normally difficult in a hazardous waste claim, he assumed that the loss could have occurred in its entirety within any one-year policy period.[8] The total settlement dollars were then divided between the seven key sites according to the percentage of Teledyne's total clean-up costs that they represented. Only one site was in operation in 1963, so only that site's losses were allocated to the policy that Seven Provinces had reinsured. That was the semiconductor site, the most polluted of all Teledyne's sites, with an estimated clean-up cost of $20.93 million. Be-

cause this represented 38.32% of Teledyne's entire clean-up costs, 38.32% of the settlement amount was allocated to that site, for a total of $843,040. Of that amount, the first $450,000 was split between ESLIC and Seven Provinces under the reinsurance agreement, with the remaining $393,040 allocated to Brandt under the excess of $500,000 reinsurance contract. ESLIC's $225,000 was in turn billed to a quota share treaty pool in which CU retained 20% of the risk. If CU had been able to identify Brandt, it would have been left with a loss of only $45,000 on the 1963–64 policy.

Six other sites had been operating during 1970 and 1971 and were therefore covered by policy E63854. The remaining $1,356,960 of the settlement was divided between those six sites, again according to the percentage of Teledyne's total clean-up costs each represented. The calculations were careful and detailed, with each site accorded a specific value ranging from $100,100 to $592,240. The total was billed to the 100% reinsurer on those sites, Agency Managers.

CU later returned the $1.3 million to Agency Managers, after it pointed out to McKay that if Teledyne's $20 million in losses were spread out evenly over the 20 year period in question, in no single year would the loss have been in excess of $1 million. Thus, ESLIC's coverage obligations under the excess of $1 million policies would never have been triggered, and no settlement money should have been attributed to those policies.[9]

### 2. Evidence of Bad Faith or Unreasonableness

CU offered contemporaneous written records of the allocation decision, reiterated and explained by McKay and Drees at trial, as evidence that the Teledyne allocation was done in good faith according to their usual settlement allocation procedures in hazardous waste claims. Seven Provinces respond-

---

8. At the same time, as CU explained in a later letter to Seven Provinces, the fairness of the allocation was also gauged by dividing Teledyne's total clean-up costs by the number of years each site was in operation. Thus, CU felt that a figure of less than one million represented a fair settlement for one year's insurance on the

semiconductor site, which had a total clean up cost of almost $21 million, spread out over twenty years of operation.

9. See *supra*, note 8.

ed by attempting to draw inferences of bad faith from discrepancies in CU's records and admissions by Drees and McKay on the witness stand. It later concluded its case with Thornton's expert testimony as to alternative methods of allocation.

Seven Provinces pointed out that CU's records are inconsistent as to how many sites were involved in the Teledyne settlement, and at what loss to CU. In his first notice to reinsurers of the claim in February 1993, Drees wrote that "I understand that there are approximately twelve sites in all, two or three of which are of major import." A CU Senior Executive Claims Advisory, prepared for CU's management in April 1993, listed the two main sites, the Semiconductor site and the Wah Chang site, and projected CU's liability as $1.95 million for the first and only $250,000 for the second.[10] The Settlement Agreement itself lists twenty-two sites.

McKay and Drees, however, explained each of these discrepancies in a manner consistent with their overall testimony. Drees' February letter and the Senior Executive summary, they explained, were merely preliminary and general descriptions of the claim meant to alert the reinsurers and CU management, respectively, of pending liability. They were not meant as detailed accountings. As for the difference between the twenty-two sites settled and the seven to which monies were allocated, McKay stated that settlements of large and complex environmental claims are normally driven by the few most polluted sites; it was to these key sites that he allocated the ultimate settlement amount. I found this testimony to be logical, consistent, and credible.

Seven Provinces' counsel tried to suggest to McKay and Drees that the allocation was a bad faith attempt to minimize CU's exposure by allocating the settlement dollars to policies on which there was available reinsurance. McKay directly denied that the allocation was affected by the existence of solvent reinsurers or the identity of the reinsurer on any particular policy, and Seven Provinces could offer no evidence to contradict him. Seven Provinces' counsel tried to elicit from both McKay and Drees that, having made a mistake that required CU to return $1.3 million to Agency Managers, CU was all the more determined to recover the full $225,000 from Seven Provinces. Both men denied such motivation, which, in any case, would be irrelevant to the reasonableness or accuracy of the Seven Provinces allocation, made at the same time as the Agency Managers allocation and long before the Agency Managers' mistake was discovered.

Seven Provinces also offered the testimony of Thornton on alternative allocations, attempting to show that the allocation was commercially unreasonable. Thornton testified that the allocation encompassed too few Teledyne sites. Instead of the twenty-two sites CU and Teledyne mentioned in their settlement agreement, the allocation should have taken into account thirty-five sites at which the EPA had identified Teledyne as a potential polluter. The reason for going beyond the settlement, he explained, was that CU had obtained a global release from Teledyne. Hence, all potential future liability on Teleydne's part should have been considered.

In addition, Thornton considered the effect on Teledyne's liability if certain other variables were altered, such as whether other polluters might have been identified at any of these sites. Finally, Thornton used a different method for allocating the total clean-up costs per site per year. In place of CU's method of apportioning the settlement among the sites according to their share of Teledyne's total $20.93 million clean-up costs, Thornton aggregated all of the clean-up costs for all of the sites and allocated that total according to each year of each site's operation.

Although Thornton's testimony established that other allocations were possible, I did not find it conclusive proof that CU's allocation was unreasonable. Were the allocation entirely unacceptable, Seven Provinces could have brought a declaratory judgment action to establish that fact, but it never did. Indeed, Thornton testified that the purpose of presenting the alternative allocations to CU

---

10. Even had $1.95 million been allocated to the semi-conductor site, of course, Seven Province's liability, capped at $225,000, would have been unaffected.

was strategic: to lead to a negotiated compromise.

### 3. Summary of Fact–Findings on Allocation Issue

I find that CU's allocation of settlement dollars to the seven most important sites that drove the settlement was reasonable. I find that it was also reasonable to allocate the settlement total according to the percentage of Teledyne's total clean-up liability that each site represented. I was not persuaded that CU should have allocated settlement dollars to sites that were never even discussed in the settlement.

I find that there was no evidence of bad faith or unreasonableness in CU's allocation of settlement monies between its policies with Teledyne.

I find that there is no evidence that CU allocated the settlement among policies so as to maximize its reinsurance recovery, or that its allocation was in any other way affected by the existence of reinsurance.

I find that there is no evidence that any portion of the settlement figure was an *ex gratia* payment made in exchange for the environmental release.

I find that CU was not obligated to allocate settlement dollars to sites identified by the EPA but not within the settlement CU actually reached with Teledyne.

### D. The 93A Claim

#### 1. The History of CU's Claims Submission

##### a. 1993–1994 Communications

CU's 93A claim is based on Seven Provinces' protracted failure to pay the claims submission CU sent it on August 26, 1993. As the correspondence between the parties was authenticated by both sides and admitted at trial, the following account draws on that correspondence as well as on the trial testimony.

On February 4, 1993, Drees wrote to all reinsurers on the Teledyne policies, alerting them that a hazardous waste claim had been made by Teledyne and a settlement was being negotiated. Attached to the letter was a copy of a CU internal spreadsheet showing the existence of the Seven Provinces reinsurance.

On August 16, 1993, McKay advised Seven Provinces of the settlement, and on Drees' advice he also sent the letter to Seven Provinces' counsel, Fred Northcraft ("Northcraft"), two days later. He then sent Northcraft the official bill for the Teledyne reinsurance on August 26, 1993, accompanied by a cover letter explaining the legal and mathematical calculations underlying the allocation as well as charts setting out the policy numbers for all CU–Teledyne policies, the Seven Provinces facultative certificate number, and a list of each of the seven sites and the percentage of the settlement dollars allocated to that site. The letter also stated that, according to the counsel who had negotiated the settlement, the environmental release was a "throw in" for which no settlement dollars had been paid.

The initial bill did not include a copy of the facultative certificate. CU itself did not have a copy of the fac. cert. in its files, but Drees assumed that Sayre & Toso would have sent a copy to the reinsurer at the time it was drafted. Drees did not know whether Sayre and Toso would have also sent a copy to ESLIC or CU as part of its normal practice. In fact, as Rebisz testified, Seven Provinces did not have a copy of the fac. cert. in its files, nor was this reinsurance relationship listed in its partial index of business written by Sayre & Toso. This was not surprising, as Rebisz testified that only 200–300 of the estimated 5,000–30,000 policies Sayre & Toso had written for Seven Provinces were listed in the index. In fact, it was more likely than not, he testified, that Seven Provinces would not have a copy of the fac. cert. when a Sayre & Toso claim was filed.

McKay followed up with several phone calls to Northcraft. On August 30, 1993, Seven Provinces responded by requesting more information. A pattern quickly developed by which CU would seek payment from Seven Provinces and Seven Provinces would respond only after some delay, and then by requesting further information. Once CU provided that information, Seven Provinces

would come back with a new and different question.

In September of 1993, Northcraft told McKay he would get back to CU soon about the billing, and that his client might seek a commutation of all outstanding reinsurance relationships with CU. In October, McKay left a series of messages for Northcraft, which Northcraft did not return. Frustrated by what he saw as an unusual reluctance to pay, McKay referred the matter to Drees, his supervisor. McKay testified that he had never dealt with a reinsurer who was so reluctant for so long to acknowledge the existence of a reinsurance relationship.

In November of 1993, Northcraft requested another copy of the August billing and supporting documentation. McKay sent that information again, along with a copy of CU's evidence of the reinsurance relationship, a Sayre & Toso record listing the Teledyne policy number (E506432), and the amount of reinsurance and the facultative certificate number for each reinsurance relationship. The relevant line clearly lists both the amount of reinsurance ($225,000) and the facultative certificate number "SP016069." The "% of reinsurance" column has some information scratched out, but "50% of 450" is clearly legible.

In early December, after several months of messages and brief and inconclusive conversations with Northcraft, Drees called Seven Provinces in the Hague directly. He was told that Martin Rebisz was the person familiar with the claim, and that Rebisz would call him back within a few days. Instead, the next communication from Seven Provinces was a letter from Northcraft, asking for more information on the existence of the reinsurance relationship and justification for the allocation decision. He stated that Seven Provinces could find no evidence in their own files of the relationship. He also protested on several grounds that Seven Provinces was being asked to pay 25% of the total settlement allocated to the semi-conductor site, pointing out that Seven Provinces had covered only one year out of thirty years of Teledyne operations and CU had other, later policies with Teledyne. This response neither acknowledged nor responded to the de-tailed explanation of the allocation that McKay had already provided in August. As he had in September, Northcraft raised an unrelated matter, Seven Provinces' desire to settle all of its reinsurance relationships with CU, most of them involving workers compensation claims. He suggested that all of these matters be settled together.

McKay wrote to Seven Provinces again in January, explaining that if the $20 million clean-up cost for the semiconductor site was spread out over 20 years, the annual exposure would be $1 million dollars. As CU had issued one year of coverage that could have been impacted by the semiconductor site, it could fairly have expected to pay at least $1 million towards the 20 year clean-up costs. It therefore felt that $843,000 represented a fair settlement. Northcraft responded with more questions. He misdescribed the allocation explanation he had been given, treating the $2.2 million settlement as a settlement between Teledyne and all of its insurers, rather than just with CU, and treating the settlement figure as if it were Teledyne's actual loss figure. He then raised two new questions: how had the settlement been allocated among the 20 years of coverage, and was Seven Provinces the only reinsurer in 1963–64. He also mischaracterized the evidence of the reinsurance relationship that CU had sent from its files as merely CU's "statement about the policy and its terms," and reported that Seven Provinces was "hesitant" to make the payment without further proof. He concluded by again asking for a global commutation of all CU–Seven Provinces business.

#### b. *The February 1995 Visit*

In February 1995, Rebisz and Thornton visited CU's Boston offices to examine the files and meet with CU officers about the claim. Rebisz and Thornton were provided with all of CU's relevant files and with a room in which to inspect them unsupervised. They inspected them for approximately four hours, but, relying on CU's promise to provide them with any copies they needed, they did not take the time to read all of the documents in detail. Instead, they tabbed several documents which CU agreed to copy and send them. One fact made an impres-

sion on Rebisz and reinforced his doubts as to whether the reinsurance relationship described in the Sayre & Toso records was still in force: the fac. cert. number in the Sayre and Toso records was "SP016069," but CU's copy of the Teledyne policy carried a handwritten note, "C/R [carries reinsurance] SP015949."

The two sides then met to discuss the claim, with Rebisz and Thornton representing Seven Provinces and McKay, Drees, Harvey Lewis ("Lewis"), and Frumer from CU. Frumer was there to explain the settlement to Rebisz and Thornton, as he had personally finalized the deal. Although Drees described the meeting as "cordial," McKay left the meeting early, angry at what seemed to him to be another Seven Provinces delaying tactic.

In the course of the discussion, Lewis mentioned that CU had retrieved a number of Sayre & Toso documents from a warehouse in California. On this point, the parties' recollections differ sharply. Rebisz remembers that Lewis refused to tell him where the warehouse was, but Drees and McKay testified that Lewis told him that to the best of his knowledge, that warehouse had been shut down. Drees added that Rebisz and Lewis discussed the possibility of joint efforts to locate where any remaining files might have been moved, and Drees asked Rebisz to let CU know if Seven Provinces discovered the location of another warehouse with Sayre & Toso records. I found Drees and McKay more credible on this point. By February 1995, it was in CU's interest to give Seven Provinces all the information it needed to decide to pay their bill. That, indeed, was the purpose of Rebisz' visit to Boston, during which, both sides agreed, Rebisz and Thornton had unrestricted access to CU files.

Towards the end of the meeting, CU requested a signed confidentiality agreement from Rebisz in exchange for copies of the documents. As Drees and McKay explained, although they would have had a duty to provide any relevant evidence to a reinsurer, Seven Provinces had not yet acknowledged

that it was a reinsurer. Rebisz testified that he assented in principle to the confidentiality agreement, and left Boston believing the documents would soon be sent to him.

A week after the Boston meeting, however, McKay wrote to Northcraft, explaining that absent some acknowledgement from Seven Provinces that it was, in fact, the reinsurer, it would not release the claims documents from Teledyne without a signed confidentiality agreement. Although CU recognized its fiduciary duty to release all documents to a reinsurer, it did not have such a duty to someone who was not a reinsurer. With that letter, McKay sent copies of all of CU's underwriting materials regarding the Teledyne risk, including several Sayre & Toso forms, the facultative certificates with the other reinsurers, Employer's Mutual and Security Mutual, and the underlying policy between Teledyne and ESLIC.[11] McKay testified that CU was not concerned that their demand for a confidentiality agreement would delay Seven Provinces' investigation, as payment had already been delayed for two years.

McKay and Northcraft spoke a few days later. Northcraft was still reluctant to acknowledge the reinsurance relationship; the closest he would come was an offer to state that Seven Provinces was "more likely than not" the reinsurer. Rebisz testified that this reflected his belief at the time. Northcraft's next offer was to recognize the reinsurance relationship in exchange for information about the location of the Sayre & Toso warehouse. McKay responded that CU believed that Seven Provinces already had sufficient information to determine whether the relationship existed and that, as to the warehouse, Lewis had already told Rebisz that the warehouse to which he had referred at the meeting was no longer in existence.

Over the next few months, the parties continued in a stalemate. CU demanded an acknowledgment of the reinsurance relationship and stated that until it had that acknowledgment it would not hand over claims information, which it believed was in any

11. Rebisz did not make a list of the records he had tabbed, so it is unclear whether these were among them.

case irrelevant to Seven Provinces' obligation to pay. Seven Provinces responded that there was a "good possibility" that Seven Provinces was the reinsurer, yet at the same time it decried the sparsity of CU's records and refused to acknowledge the relationship until it had obtained all "reasonably available information." Seven Provinces continued to demand the claims information (which would not have revealed anything about the existence of the relationship) and the location of the warehouse (which CU had already stated was closed). In May 1995, CU filed this suit.

### c. *August 1995: Locating the Certificate*

By August 11, 1995, Seven Provinces had finally located the fac. cert. It contained exactly the terms, and the policy number, listed in the Sayre & Toso records CU had sent to Seven Provinces two years before. Yet rather than acknowledging that the reinsurance relationship had been proven and settling the litigation, Seven Provinces continued to raise new issues and questions. In October 1995, for example, Rebisz wrote to Drees, asking why the quota share treaty "does not apply ... and why part of the Teledyne settlement would not be recoverable from your Quota Share reinsurers." He also questioned why no money was allocated to the difference in conditions policy. He even raised, at that late date, the issue of CU's initial decision that its policies with Teledyne covered hazardous waste claims, although conceding that "[i]t would appear that under the terms of the policy, denial of coverage for the environmental claims would be hard to justify."

Drees refused to respond to these questions, except by demanding payment. He testified that he was "baffled" by these requests, because he believed that Seven Provinces had enough information to decide whether to pay the bill. He could see no relevance in the actual quota share treaty, or in the difference in conditions policy.

Seven Provinces' next step was to offer $25,000, which Rebisz described in one sentence as "a fair resolution of your claim" and in the next as an "interim payment, pending receipt of further documentation." After consulting with CU's litigation counsel, Drees wrote to Rebisz rejecting this offer and demanding full payment.

Drees explained, and Rebisz concurred, that it was not unusual in the industry for a reinsurer to pay the full amount billed, reserving rights to recover it should the bill turn out to be incorrect. Drees also felt $25,000 was "woefully inadequate" even as an interim payment, given that over two years had passed since the billing. Instead, he took the opportunity to demand that Seven Provinces identify which issues were still unresolved. Not surprisingly, given the confusion caused by Seven Provinces' constantly shifting questions, Drees misunderstood Seven Provinces' remaining objections: he failed to mention the dispute over allocation which took up several days of trial testimony, because in October 1995 he thought it had already been resolved.

In 1996, Seven Provinces began taking a new approach. Now in possession of proof of the reinsurance relationship, it demanded a host of documentation, including a "certified copy" of the quota share treaty, further justification of the allocation decisions, accounts receivable documenting all other amounts CU had been paid by any other insurers on the Teledyne claim, "documentation" of why the quota share treaty and the difference on conditions policy were not applicable, and "all in/external reinsurance 'lay-offs'," a demand it acknowledged would have to be negotiated before it would be reasonable or workable. It repeatedly demanded further explanations of the allocation decision, which it now characterized as "a departure from and in contradiction to the underlying 'global settlement' with Teledyne." It also began to offer alternative allocation "models" developed by Thornton.

### 2. *Summary of Conclusions on 93A*

CU, through the testimony of McKay and Drees, described this history as one of its sincere and dogged attempts to collect on its August 1993 claims submission, and Seven Provinces' evasiveness and obstructionism. On behalf of Seven Provinces, Rebisz described it as at worst an unfortunate cross-cultural misunderstanding. At first, he explained, Seven Provinces was merely concerned about finding more evidence of the

reinsurance relationship before paying such a large claim on such an old agreement. Rebisz testified that he had only once paid a claim without finding the fac. cert., and then only under court order. He also expressed concerns about whether the relationship had been cancelled between 1963 and 1993, an issue he had not raised in his correspondence with CU prior to trial and which does not seem to be related to the absence of the fac. cert. but merely the age of the claim.

After the fac. cert. was found, Rebisz explained, Seven Provinces' further requests for information and challenges to the coverage, settlement, and allocation decisions were merely the normal investigations that every reinsurer is entitled to conduct. At all times, he maintained, Seven Provinces was willing to compromise the claim. It was CU that was withholding documents and the location of the Sayre & Toso warehouse.

I found McKay and Drees credible. They described in consistent detail an allocation and collection procedure that was reasonable and customary. They openly admitted that they became increasingly frustrated with Seven Provinces and distrustful of its purpose in requesting ever new and different information from their files. I found credible their explanation of the occasions on which they hesitated or refused to provide further documentation or justifications of their bill.

I did not find Rebisz credible. He was evasive on the stand, often refusing to answer direct questions about the facts of the case, responding instead with generalized assertions about his usual behavior in handling reinsurance claims or explanations of his understanding of reinsurance industry practice in general. On the central fact of when he saw the fac. cert. for the first time, Rebisz could not remember a single date or detail.

I did not find credible Rebisz's denial that Seven Provinces had deliberately avoided coming to a decision on whether to pay CU's bill. Disingenuously, Rebisz attempted to disclaim any responsibility for the delay in responding to CU's bill by stating that the first billing sent to the Hague must have been lost in the mail, so that he had not found out about CU's billing or seen any proof of the reinsurance relationship until July 1994. He acted as if he could not be charged with the knowledge of his lawyers, who had received the bill and supporting documentation immediately in early August 1993. In a similarly evasive vein, Rebisz repeatedly complained of the few instances on which CU had withheld information (the Teledyne claims documents and the location of the defunct warehouse) as if this excused all of Seven Provinces' own logically and factually unrelated dilatory tactics.

Throughout his testimony, Rebisz evaded the direct issues of whether he believed Seven Provinces was obligated to CU and, if so, for how much. When I asked him how much he believed Seven Provinces owed CU, now that he had obtained the fac. cert. that proved the existence of the reinsurance obligation, he replied, anywhere from the full amount of $225,000 to $45,000, the figure that would reflect his interpretation of the net retention clause. He then corrected his answer, to anything from $225,000 to nothing, even though Seven Provinces had at no time since the fac. cert. had been found offered any argument that there was a valid defense to the entire bill. Yet at the same time Rebisz maintained that Seven Provinces was not refusing to pay, but merely would prefer to mediate or arbitrate in an attempt to compromise the bill. Companies of the stature of CU and Seven Provinces' parent company ING, he stated, should be able to work out some fair commercial settlement of the claim without recourse to litigation.

Rebisz pointed to two circumstances that would have given a reinsurer some concern about the CU billing: first, the apparent non-existence of the fac. cert., and second, the discrepancy between the fac. cert. number in the Sayre & Toso records and the number handwritten on CU's copy of the Teledyne policy. Nonetheless, these two facts cannot account for the variety and multiplicity of Seven Provinces' objections to the billing. Rebisz's own testimony at trial presented a moving target in keeping with the Seven Provinces' record of constantly shifting defenses and objections to payment. One moment, he testified that he had never reached a decision on whether CU's allocation was unreasonable. The next moment, he testified

that the allocation was not up to generally accepted standards, indeed, "way out of line," because it allocated no money to the release and considered too few Teledyne sites. At trial, he expressed an ongoing concern that the reinsurance relationship might have been cancelled or amended some time after 1963, a concern that he did not express in any of his correspondence with CU prior to trial and which his counsel did not introduce into this litigation.

Likewise, Rebisz raised again on the stand defenses to payment that had long been resolved and that were, in any case, ineffective as a mater of law. For example, he expressed continuing doubts about Seven Provinces' duty to pay CU, based on CU's failure to allocate settlement dollars to the difference in conditions policy, in spite of CU's clear statement, supported by documentation, that Teledyne had made no claim on that policy and it was considered inapplicable to hazardous waste claims under United States insurance law. He expressed doubts on the stand that the underlying CU policy even covered Teledyne's hazardous waste liability, because of the "owned property" exclusion, in spite of having written to CU in October 1995 that "under the terms of the policy, denial of coverage for the environmental problem at issue might be hard to justify," and in spite of the fact that such challenges to the basic coverage decision are barred, as Rebisz acknowledged, by the doctrine of "follow the settlements," [12] a doctrine which is expressly incorporated into the fac. cert.

Seven Provinces' counsel participated in this "moving target" strategy even at trial, raising the "owned property exclusion" issue on the second day of trial, without ever having raised it at any time during the two years of litigation. I found Seven Provinces' considerable evidence of alternative possible allocations equally disingenuous. After conceding on the first day of trial that the law barred any challenges to allocation except those based on bad faith or *ex gratia* payments, Seven Provinces endeavored at length to convince the Court that the CU allocation was unreasonable.

I find that the length of time that has elapsed without Seven Provinces coming to a decision on whether to pay is far outside normal industry practice. Rebisz admitted on the stand that he was aware of American rules penalizing a reinsured if it does not collect on a claims submission within ninety days by reducing the amount of surplus available to write new business. Yet Seven Provinces has delayed payment for over four years after receiving the bill, and over two years since locating the fac. cert.

I find that Seven Provinces' numerous and constantly shifting requests for information from CU represented an attempt to evade payment of its reinsurance obligations. Not only does the record of correspondence between the parties reflect that Seven Provinces' objections to payment were frequently changing, but Seven Provinces' behavior at trial continued in this pattern.

I find that Seven Provinces' intent in its dealings with CU was to delay and object to payment so that CU would compromise the Teledyne bill and agree to a global commutation of all of the business between the parties.

## II. CONCLUSIONS OF LAW

### A. Seven Provinces' Obligations Under The Facultative Certificate

#### 1. The Terms of the Facultative Certificate

Unambiguous contracts must be enforced according to their terms, *Somerset Sav. Bank v. Chicago Title Ins. Co.*, 420 Mass. 422, 649 N.E.2d 1123, 1127 (1995), yet here I found the terms of the fac. cert. to be ambiguous. In construing this ambiguous language, I must view the fac. cert. as a coherent whole, considering "every phrase and clause ... [in light of] all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties." *Boston Edison Co. v. F.E.R.C.*, 856 F.2d 361, 365 (1st Cir.1988) (quoting *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 494 N.E.2d 374, 378

---

12. For a discussion of this doctrine, *see infra,* Section II(A)(2)(a).

(1986)). Custom and usage may "aid in policy interpretation, not as tending to contradict or vary a contract, but on the theory that usage forms part of the contract." *Id.; citing Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.,* 416 Mass. 839, 626 N.E.2d 878, 881–82 (1994); Restatement (Second) of Contracts § 222 comment (b) 882 (1981).

Having found that the language of the fac. cert. was ambiguous, I heard testimony from experts on both sides as to its best interpretation in light of custom and practice in the reinsurance industry. As explained more fully above, I found the explanation advanced by Gottheimer more credible and persuasive, both because of his greater knowledge of and in depth explanation of industry custom and practice and because his interpretation made compelling sense of the disputed provision as a whole. Therefore, I conclude that, under the terms of the fac. cert., Seven Provinces had an obligation to reimburse CU for $225,000 of its loss on the Teledyne claim. I also conclude that that obligation was not reduced by the existence of treaty reinsurance. I conclude that Seven Provinces' liability under the terms of the contract between the parties is $225,000.

### 2. CU's Allocation of the Teledyne Settlement

Two separate but related doctrines govern the legal effect of Seven Provinces' challenges to CU's allocation of the Teledyne settlement. The "follow the fortunes" doctrine requires reinsurers to accept a reinsured's good faith decision that a particular loss is covered by the terms of the underlying policy, while the "follow the settlements" doctrine requires reinsurers to abide by a reinsured's good faith decision to settle, rather than litigate, claims on that policy. As Gottheimer testified, the reinsurer "must go along with however the insurer settles the claim." Both doctrines have been long established by law in the reinsurance industry, and the "follow the settlements" doctrine is, in addition, incorporated explicitly into the fac. cert. in this case.

### a. Seven Provinces' Challenges to CU's Coverage and Settlement Decisions

The "follow the settlements" doctrine requires the reinsurer to cover settlements made by the reinsured, as long as they are not fraudulent, collusive, or made in bad faith. *Aetna Casualty & Sur. Co. v. Home Ins. Co.,* 882 F.Supp. 1328, 1346 (S.D.N.Y.1995). The reinsurer bears the burden of showing bad faith on the reinsurer's part. The standard is a high one: the reinsurer must show "gross negligence or recklessness," *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194 (3d Cir. 1995), or that the settlement was not even "arguably" within the scope of the reinsurance coverage. *Mentor Ins. Co. (U.K.) v. Norges Brannkasse,* 996 F.2d 506 (2d Cir. 1993). The reinsurer cannot dispute good faith determinations that a risk was covered by the underlying insurance policy, *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 280 (2d Cir.1992), or good faith interpretations of policy terms. *International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.,* 998 F.2d 504 (7th Cir.1993); *Aetna,* 882 F.Supp. at 1347. The reasonableness of the reinsured's judgment is to be determined as of the time of settlement. *Aetna,* 882 F.Supp. at 1351.

The purpose of the "follow the settlements" doctrine is to prevent the reinsurer from second-guessing the good faith settlement decisions of the ceding company. *Aetna,* 882 F.Supp. at 1346. If the ceding company knew that its settlement decisions could be challenged by every reinsurer, there would be little incentive to settle with the insured. The costs and risks of litigation avoided by settling with the insured would only be revived at the reinsurance stage. "The goals of maximum coverage and settlement that have been long established would give way to a proliferation of litigation." *International Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London,* 868 F.Supp. 917, 921 (S.D.Ohio 1994).

Seven Provinces has been unable to produce any evidence of bad faith or fraud on CU's part in its decisions about whether Teledyne's environmental liability was cov-

ered by the general liability policy E–506432, in spite of the "owned property" exclusion emphasized by Seven Provinces' counsel, and whether and for how much to settle such liability. Nor did it produce any such evidence with regard to CU's assessment that Teledyne's losses were *not* covered by the difference in conditions policy.

■ In fact, Seven Provinces did not offer any testimony from the officers or agents of CU who made these decisions. McKay and Drees both testified unrebutted that they allocated CU's liability between sites, policies, and reinsurers after the coverage and settlement decisions had been made. This is not surprising, as both are employed in CU's reinsurance (or "ceded") department; Seven Provinces called no witnesses from CU's claims department who might have been able to testify to the *bona fides* of the claims decisions. Indeed, when confronted with Seven Provinces' "owned property exclusion" argument, Drees replied that such matters of claims interpretation were outside his area of expertise. He suggested that Seven Provinces should have raised that issue with the claims people they met during their February 1995 visit to CU's offices. Thus, I conclude that Seven Provinces' challenge to CU's coverage and settlement decisions fails for lack of any evidence of the required elements of bad faith, fraud, or unreasonableness.

In addition, I conclude that Seven Provinces' challenge to the coverage decision based on the "owned property exclusion" is meritless as a matter of law.[13] "Owned property" exclusions are meant to exclude coverage for damage to the insured's property, a kind of loss that is normally covered by a property insurance policy, not a liability policy. They have been raised numerous times as defenses to insurance coverage of liability for releases of hazardous waste by the insured onto its own property. The vast majority of courts that have considered the issue, however, have rejected the argument that Seven Provinces is making here on the grounds that contamination of the environment should be understood as damage to the

rights of the public, the sovereign, and other third parties, rather than as damage to the particular insured property on which the contamination first occurs. More pragmatically, the losses for which an environmental contaminator seeks insurance coverage are rarely the depreciation in value of the property; it is almost always, as here, the costs of cleanup demanded by the government—on its face more like liability than property damage. *See Intel Corp. v. Hartford Accident and Indem. Co.*, 952 F.2d 1551, 1565 (9th Cir. 1991); *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 704 (7th Cir.1994); *Chemical Applications Co. v. Home Indem. Co.*, 425 F.Supp. 777, 779 (D.Mass.1977); *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394, 400 (D.N.J.1987); *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1279–1280 (1990); 4 Susan M. Cooke & Christopher P. Davis, *The Law of Hazardous Waste: Management, Cleanup, Liability, and Litigation* §§ 19.05[3][d], 19–140 (1994 and 1997 Supp.).

### b. *Seven Provinces' Challenge to the Allocation*

■ Seven Provinces attempts to avoid the effect of the "follow the settlements" doctrine by arguing that what it is challenging is the good faith of the allocation, rather than of the settlement. This is a distinction without a difference. In the first place, a number of attacks it launches on CU's allocation are in actuality attacks on the settlement. CU's judgment that the loss was not excluded by the "owned property exclusion" or covered by the "difference in conditions" policy goes to the heart of its decisions on which policies covered the loss and should be settled rather than litigated.

Secondly, the attempt to distinguish settlement from allocation would undermine the entire "follow the settlements" doctrine. In practical terms, the determination of which among several policies covers which particular loss among many is not much different from the more general decision that the losses are covered by the policies. Both are issues of judgment that the reinsured must

---

**13.** As defendant's counsel conceded in open court, moreover, it had never been raised in the litigation at all until defendant's cross-examination of Drees on the third day of trial.

be allowed to make for the sake of encouraging settlement. Review of either type of decision has an equal likelihood of undermining settlement and fostering litigation.

Most settlements of complex environmental claims necessarily involve a number of sites, a range of years in which the exposure could have occurred, and—if the reinsured and the insured have an ongoing relationship—more than one policy of insurance. If a reinsured could be forced into litigation over its good faith judgment as to which policies covered which losses, it would be impossible for it to come to any settlement of such complex claims. When several reinsurers are involved, there would be a risk of successive litigations, in which each reinsurer offered an alternative allocation model that would reduce its own liability.

This conclusion is bolstered by the flexible state of the law in this area. One recent analysis identifies four major theories of when environmental damage triggers insurance coverage, and four methods of allocating losses among policies. *See* Michael J. Brady and Lawrence O. Monin, *Reinsurance Disputes: Death of the Handshake*, 61 Def. Couns. J. 529 (1994); *see also* David O. Larson, et al., *Review of Recent Developments in Excess, Surplus Lines, and Reinsurance Law*, 32 Tort & Ins. L.J. 359, 363–64 (1997) (describing the range of permissible allocation methods). A ceding insurer could, in good faith, select any one of sixteen options, only to have its various reinsurers each propose an alternative formula. If the "follow the settlements" principle did not apply to the allocation of those settlements, litigation would surely proliferate. *See* Lawrence O. Monin and Michael J. Brady, *Updating Reinsurance Law Developments: The Gloves Are Beginning to Come Off*, 63 Def. Couns. J. 219 (1997)(concluding that "the courts, with rare exceptions, are favoring good-faith reasonable allocations by the ceding companies").

 I therefore conclude that the doctrine of "follow the settlements" requires the reinsurer to follow the reinsured's good faith and reasonable allocation of settlement dollars between different policies and sites. Therefore, my conclusion as to the reasonableness and good faith of CU's allocation of the Tele-

dyne settlement dispenses with Seven Provinces' challenges to payment on this front.

### B. *CU's 93A Claim*

 Chapter 93A allows one business to sue another over conduct that is "unfair," Mass. Gen. L. ch. 93A, §§ 2(a), 11, including acts that are associated with the breach of a contract. The plaintiff must prove both that the act was unfair, and that it suffered a loss as a result. Mass. Gen. L. ch. 93A, § 11. CU has shown the loss it suffered: an over four year delay in payment and significant legal costs in collecting the amount it is owed. *See Refuse & Environmental Systems, Inc. v. Industrial Services of America, Inc.*, 932 F.2d 37, 43 (1st Cir.1991) (litigating a meritless claim may constitute a 93A violation). The more difficult question is whether Seven Provinces' conduct was sufficiently unfair so as to rise to the level of "rascality" required by chapter 93A. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979); *Quaker State Oil Refining v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989)(adopting *Levings* standard); *accord Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir.1996).

Although "mere breaches of contract, without more, do not violate chapter 93A," *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985) (citing *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 251 (1979)); *Bradley v. Dean Witter Realty*, 967 F.Supp. 19, 29 (D.Mass. 1997), a 93A claim can nonetheless arise out of a breach of contract, if the breach is "in disregard of known contractual arrangements" and "intended to secure benefits for the breaching party …." *Anthony's Pier Four v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 821 (1991); *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163, 1165 (1986).

As the Massachusetts Supreme Judicial Court has clarified, the theme of the cases in which a breach of contract has amounted to a 93A violation is "the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of con-

tract has an extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal,* 33 Mass.App.Ct. 219, 598 N.E.2d 666, 670 (1992); *accord NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 33 (1st Cir.1994) (citing *Atkinson* and suggesting that 93A liability would arise where a "defendant knowingly breached a contract in order to secure additional benefits to itself to the detriment of a plaintiff"). Often, the defendant withheld performance without justification in an attempt to renegotiate the terms of the parties' relationship. *See Anthony's Pier Four,* 583 N.E.2d at 814–815 (arbitrary withholding of architectural approval in order to extort renegotiation of the financial terms of a joint development project found to be a 93A violation); *Pepsi,* 754 F.2d at 18 (customer withheld payment due distributor as leverage in bargaining to receive more product in the future). The breaching party's aim is to "force ... [the other party to the contract] to do what otherwise it could not be legally required to do." *Id.*

From the outset, Seven Provinces avoided payment on CU's claims submission while seeking to renegotiate the terms of the parties' relationship. At first, Seven Provinces' questions about the claim were linked to its request to come to a global commutation of all business between the two companies. As CU continued to insist on payment of the Teledyne claim before any such commutation would be discussed, Seven Provinces began insisting on a compromise of the Teledyne claim amount, either through mediation or reallocation of the entire Teledyne settlement. Rebisz reiterated at trial that what he was seeking was a compromise, and in apparent pursuit of that goal, he refused to express an opinion about how much Seven Provinces owed on the claim. Thus, Seven Provinces' behavior fits within the 93A framework outlined by the Supreme Judicial Court: it withheld performance due under the contract in order to renegotiate the bargain between the parties and force CU to do what it otherwise was not legally obliged to do, namely, compromise a valid claim.

Seven Provinces' behavior was particularly egregious when seen in the context of the mores of the reinsurance industry, an industry which has operated for centuries on the principle of "utmost good faith" ("*uberrimae fidei* "). Gottheimer testified to the traditional mores of the industry: that reinsurance is "an honorable engagement," in which "gentlemen's agreements" were secured by a handshake. Under this view, the reinsurer and the reinsured are "partners," who owe each other a duty of "utmost good faith." Admittedly, these traditions of trust and mutual reliance came under strain in the 1980s. Because of high interests rates, Gottheimer testified, insurers paid less attention to the risks they insured, and the quality of the underwriting began to suffer. At the same time, environmental and asbestos liability began to upset the calculations on which many insurance relationship had been founded. *See Compagnie de Reassurance,* 944 F.Supp. at 993. Trade publications are beginning to note the change in tone, speaking of the "death of the handshake." Brady & Monin, *supra.*

Seven Provinces' conduct is more in keeping with this new climate. It seems to believe that delaying payment on a bill cannot be a violation of industry practice as long as the reinsured and the reinsurer ultimately reach some compromise. Although relying on the principle of utmost good faith when complaining of CU's refusal to turn over Teledyne underwriting documents, they suggest that it did not govern their own obligations to settle the CU claim, for example by offering full payment with a reservation of rights. In spite of the strain on the doctrine of *uberrimae fidei,* however, it continues to be a controlling legal principle in the reinsurance industry. *See Compagnie De Reassurance D'Ile De France v. New England Reinsurance Corp.,* 57 F.3d 56, 72 (1st Cir.1995), *cert. denied,* 516 U.S. 1109, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995); *North River,* 52 F.3d at 1212; *Unigard Sec. Ins. Co. v. North River Ins. Co.,* 4 F.3d 1049, 1066 (2d Cir.1993); *Christiania,* 979 F.2d at 278; *Allendale Mut. Ins. Co. v. Excess Ins. Co.,* 992 F.Supp. 278, 281 (S.D.N.Y.); *Compagnie,* 944 F.Supp. at 994; *Employers Reinsurance Corp. v. Admiral Ins. Co.,* 1990 WL 169756, *3 (D.N.J.). By violating this established principle, Seven Provinces' actions fell "within ... the penumbra of some common-law, statutory, or other

established concept of unfairness." *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975).

Although Seven Provinces' objections to payment bore the hallmarks of bad faith almost from the outset, until the rediscovery of the facultative certificate in August 1995, it had legitimate reasons for concern about the details of its obligations to CU. As Drees himself conceded, it is unusual for neither side to have a copy of the certificate. Any suspicion that the certificate was missing because the relationship had been somehow amended or discharged could have reasonably been reinforced by the discrepancy between the facultative certificate numbers on the Sayre & Toso records and on the Teledyne policy.

However, the genuineness of this concern is called into doubt by Rebisz's testimony that already in February 1995 he believed that Seven Provinces was "more likely than not" CU's reinsurer on the Teledyne risk. Nonetheless, because an insurer is not normally liable under 93A if it denies coverage based on a plausible interpretation of its obligations, *see Alan Corp. v. International Surplus Lines Ins. Co.*, 823 F.Supp. 33, 44 (D.Mass.1993), *aff'd*, 22 F.3d 339 (1st Cir. 1994); *Lumbermen's Mut. Casualty Co. v. Offices Unlimited, Inc.*, 419 Mass. 462, 465 645 N.E.2d 1165, 1169 (1995), I conclude that Seven Provinces is only liable under 93A from the time it discovered the facultative certificate, namely, August 1995.

### III. *CONCLUSION*

Under the terms of the contract between the parties, Seven Provinces owes Commercial Union $225,000 as reinsurance on the Teledyne policy. Since it located the facultative certificate memorializing that contractual obligation in August 1995, Seven Provinces' continued refusal to honor its obligations, combined with its constantly shifting and often meritless objections to payment, constituted an egregious breach of its duty of utmost good faith and a violation of Mass. Gen. L. ch. 93A, § 11.

Judgment is entered for the plaintiff in the amount of $450,000, representing the amount owed under the fac. cert., multiplied by two pursuant to Mass. Gen L. ch. 93A, plus attorneys' fees since August 1995, and costs. Both parties shall submit pleadings concerning the appropriate date and rate for calculating prejudgment interest. Seven Provinces shall submit its opposition to CU's application for attorneys' fees, if any, by July 2, 1998.

**SO ORDERED.**